ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:   (415) 788-4220
Facsimile:    (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law

*Counsel for Plaintiff*

*[Additional Counsel Appear on Signature Page]*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTOPHER GORDON, | **Case No. 17-CV-1678** |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | Jury Trial Demanded |
| ROBERT D. SZNEWAJS; HALLE J. BENETT;  JONAH  SCHNEL;  and JEFFREY KARISH, | |
| Defendants, | |
| -and- | |
| BANC OF CALIFORNIA, INC. | |
| Nominal Defendant. | |

Plaintiff Kristopher Gordon ("Plaintiff") brings this shareholder derivative action on behalf of nominal defendant Banc of California, Inc. ("Banc" or the "Company"). The allegations in this Complaint are based upon personal knowledge as to Plaintiff and on information and belief as to all other matters. Plaintiff's information and belief is based upon the investigation conducted by and under the supervision of counsel which included, among other things, review and analysis of the following: (a) the Company's public filings with the Securities and Exchange Commission ("SEC"); (b) other publicly available information, including articles in the news media and analyst reports; (c) information on the Company's website and press releases; (d) complaints and related materials in litigation commenced against some or all of the Individual Defendants and/or the Company, including, without limitation, *In re Banc of California Securities Litigation*, Docket No. 8:17-cv-00188-AJG (C.D. Cal. Jan. 23, 2017) and *Seabold v. Banc of California*, Case No. BC-674694 (Cal. Los Angeles Super. Ct. September 5, 2017); and (e) applicable rules and regulations.

## NATURE OF THE ACTION

1.      This action comes on the heels of a tumultuous 11-month period at Banc following the publication of an October 18, 2016 blog post on *SeekingAlpha* alleging the existence of a web of improper and dangerous relationships between Jason Galanis ("Galanis"), a Los Angeles financier and convicted securities fraudster, and Banc's senior managers, including Steven Sugarman ("Sugarman"), then Banc's Chief Executive Officer ("CEO"), and Chad Brownstein ("Brownstein"), then Banc's Lead Independent Director.

2.      On the day of the blog post, Banc immediately sought to quell the crisis in a press release, stating that it had been aware of the Galanis allegations for some time, but that Banc's Board, acting through "disinterested directors," had already conducted an "independent" investigation of the matter "led by Winston & Strawn," a law firm. Banc's press release went on to discredit the allegations in

the *SeekingAlpha* blog post and denied the existence of ties between Galanis and Banc. On October 19, 2016, these denials were repeated and reinforced by Banc's General Counsel in an investor conference call.

3.      On or about October 27, 2016, Banc's Board created a Special Committee to investigate the alleged improper relationships and transactions. On January 23, 2017, Banc reported the Special Committee's conclusion that the Galanis allegations were false, but also disclosed that its October 18, 2016 response to the *SeekingAlpha* blog post had triggered an SEC investigation.

4.      Banc admitted that the October 18, 2016 press release had misled shareholders about the earlier "independent" investigation. Specifically, Banc admitted that the earlier investigation was not directed by "disinterested" board members at all, but by "management," and that Winston & Strawn was not independent, having previously represented Banc and Sugarman personally.

5.      Although the Galanis allegations were allegedly discredited, Sugarman and Brownstein were nevertheless promptly forced out of the Company. With their departure, members of the Special Committee were able to secure control of Banc, and in doing so, divert attention away from their own misconduct.

6.      In a recently filed wrongful termination lawsuit against Banc, former top Banc officer Jeffrey T. Seabold ("Seabold") alleges that the Special Committee members charged with independently investigating the claims of related party transactions and self-dealing had not done so in good faith, but rather had "scapegoated" Sugarman, Brownstein, and others as part of a "power grab" to conceal their own improper relationships and transactions.

7.      Seabold has further alleged that, since Sugarman's departure, Banc's new executive management team, with approval of the Company's Audit Committee, has manipulated earnings per share (EPS) to maintain the appearance of Banc's financial success. Seabold claims that Banc's current leadership eliminated transparency from financial reporting and budgeting so they could

improperly reverse accrued liabilities for employee bonuses earned in 2016, improperly boosting reported financial results.

8. As alleged herein, certain of Banc's current directors have breached their fiduciary duties to the Company. First, these directors authorized, endorsed, and/or failed to immediately correct the Company's false October 18, 2016 press release issued in their name, directly resulting in an SEC investigation. Second, as alleged by Seabold, the Special Committee was composed of conflicted directors motivated to take control of the Company, whose conduct has not only entrenched the wrongdoers, but further jeopardized the Company's operations. Third, as alleged by Seabold, Banc has engaged in accounting gimmicks with the knowledge of the Chairman of the Board's Audit Committee, designed to inflate results for the first quarter of 2017.

9. These developments have severely damaged the Company. Plaintiff now brings this suit derivatively on Banc's behalf to remedy the misconduct and seek redress for breaches of their fiduciary duties of loyalty, good faith, and due care. A demand to bring the asserted claims is excused for futility, as (a) the Company faces the prospect of irreparable harm absent shareholder action and (b) a majority of the current Board lacks independence and/or is hopelessly conflicted and interested in the subject matter of the case.

## JURISDICTION AND VENUE

10. Banc is a corporation that conducts business and maintains its executive headquarters in this District. The Individual Defendants have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11. Jurisdiction of this action is based on 28 U.S.C. § 1332(a)(2), there being diversity of citizenship between Plaintiff and Defendants because Plaintiff, on the one hand, and the Defendants, on the other, are citizens of different states. The amount in controversy exceeds $75,000, exclusive of interest and costs.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) and (d). Further, a substantial portion of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

### THE PARTIES

13. Plaintiff Kristopher Gordon has held shares of Banc stock continuously since September 2016 and is a current Banc shareholder. Plaintiff is a citizen of Georgia.

14. Nominal defendant Banc is a Maryland corporation with its principal executive offices located at 3 MacArthur Place, Santa Ana, California 92707. Banc common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BANC." Banc is a citizen of California.

15. Defendant Robert D. Sznewajs ("Sznewajs") was appointed as Chair of the Board of Directors in January 2017 after having served on the Board of the Company since 2013. Defendant Sznewajs serves as a Board designated "financial expert" and is a member of Banc's Audit Committee and Compensation and Human Capital Committee (the "Compensation Committee"). Sznewajs is a citizen of California.

16. Defendant Halle J. Benett ("Benett") has been a director of the Company since December 2013. Defendant Benett serves on Banc's Audit Committee and Nominating and Corporate Governance Committee. Benett is a citizen of California.

17. Defendant Jonah F. Schnel ("Schnel") has been a director of the Company since 2013. Defendant Schnel is a member of the Nominating and Governance Committee. Schnel is a citizen of California.

18. Defendant Jeffrey Karish ("Karish") has been a director of the Company since 2011. Defendant Karish serves on Banc's Audit Committee and the Compensation Committee. Karish is a citizen of California.

19.     Defendants Sznewajs, Benett, Schnel, and Karish are sometimes collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES

### Duties of the Individual Defendants

20.     By reason of their positions as officers, directors, and/or fiduciaries of Banc and because of their ability to control the business and corporate affairs of Banc, the Individual Defendants owed and owe Banc and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Banc in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Banc and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

21.     To discharge their duties, the officers and directors of Banc were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Banc were required to, among other things: ensure the Company complied with its legal obligations and requirements, including complying with regulatory requirements by devising and implementing a system of internal controls sufficient to ensure the accuracy of Banc's financial statements and reporting; conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; remain informed as to how Banc conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices as necessary to comply with applicable laws; and ensure the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws.

22.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Banc, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

23.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Banc, and was at all times acting within the course and scope of such agency.

**Duties of the Audit Committee**

24.    The Audit Committee is comprised of Defendants Benett, Karish, and Sznewajs, and non-party Richard Lashley ("Lashley"). Lashley is the Audit Committee's Chairperson.

25.    The Audit Committee is responsible for, among other things, monitoring and oversight of: the integrity of the Company's financial statements and financial accounting practices; the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company; the effectiveness of the Company's internal controls over financial reporting; and the Company's compliance with legal and regulatory requirements.

26.    According to its Charter, the Audit Committee is to be comprised of at least three members appointed by the Board who meet the independence and other requirements of the NYSE.

27.    The members of the Audit Committee, including its Chairperson, are appointed by the Board on recommendation of the Nominating and Governance Committee.

**Duties of the Nominating and Governance Committee**

28.    The Company's Nominating and Governance Committee is comprised of Defendants Benett and Schnel and non-parties Lashley and Bonnie Hill ("Hill").    Defendant Benett is the Chairperson of the Nominating and Governance Committee.

29.     The Nominating and Governance Committee is appointed by the Board to assist the Board in discharging its responsibilities, including identifying individuals qualified to become Board members, consistent with criteria approved by the Board, to recommend to the Board director nominees, lead the Board in its annual review of the Board's performance, and recommend to the Board the membership of each Board Committee.

30.     The Nominating and Governance Committee is to be comprised of at least two directors who meet the independence requirements of the NYSE.

31.     The Nominating and Governance Committee's responsibilities include the following: to retain and terminate any search firm to be used to identify director candidates and to have sole authority to approve the search firm's fees and other retention terms; actively seek individuals qualified to become Board members for recommendation to the Board for appointment or nomination for election as directors; identifying, screening, and recommending to the Board candidates for membership on the Board; annually assess the independence of the Board members; and have the authority to review, oversee, and approve, or recommend to the Board for approval, any insider or related party transactions.

32.     The Nominating and Governance Committee also is charged with considering issues involving possible conflicts of interest involving directors and executive officers and review the appropriateness of the continued service on the Board of any non-employee director who has changed his or her employment or occupation, in light of his or her changed responsibilities, association, or circumstances, and recommend, as appropriate, action by the Board to accept or reject any offered resignation of such director; and assist the Board with succession planning for the position of CEO and senior management.

**SUBSTANTIVE ALLEGATIONS**

**A.  Background.**

33.    In 2010, Banc's predecessor entity, First PacTrust, was floundering in the post-recession economy. COR Capital LLC ("COR") stepped forward and helped contribute $60 million to revitalize the bank. COR was owned and managed by Sugarman, who joined First PacTrust's Board of Directors.  On September 21, 2012, Sugarman became First PacTrust's CEO.

34.    In May 2013, Seabold became an employee of First PacTrust. Seabold previously assisted Sugarman in raising the $60 million capital infusion in November 2010. Seabold's employment began when Banc acquired CS Financial, Inc. ("CS"), a mortgage lender Seabold founded.

35.    In July 2013, First PacTrust renamed itself Banc of California and promoted itself as a "community investment leader." Banc has experienced phenomenal growth since 2010 as its assets have grown to more than $10 billion.

36.    As of April 15, 2016, the Banc's Board consisted of seven (7) directors: Defendants Schnel, Benett, Sznewajs, and Karish, along with non-parties Sugarman, Brownstein, and Eric Holoman ("Holoman").

37.    Banc's 2016 Proxy Statement included a statement that the Company's Nomination and Corporate Governance Committee had conducted its annual review of "all relationships between the Company and each Director and Nominee and has affirmatively determined that, with the exception of Mr. Sugarman, who is a Company employee, each non-employee director . . . has only immaterial relationships with the Company, and accordingly each has been determined to be independent under these standards."

38.    According to the Proxy Statement, the Board also concluded that all members of the Audit Committee and Nominating and Corporate Governance Committee were independent, as that term is defined by the NYSE standards and the Company's Corporate Governance Guidelines.

39.     In the "Transactions With Related Persons" section of the Proxy Statement, the Company listed a number of related party transactions, but the only ones relating to a director involved non-party Sugarman. Sugarman disclosed several relationships, including with St. Cloud Capital LLC, Palisades Group, LLC (which had used Sugarman's brother as a consultant), and CS (which was previously controlled by non-party Seabold).

## B.     The Galanis Allegations.

40.     On October 18, 2016, *SeekingAlpha*.com published an article entitled "BANC: Extensive Ties To Notorious Fraudster Jason Galanis Make Shares Un-Investable." The article claimed that Banc directors Sugarman and Brownstein, along with Seabold, had ties to Galanis. Galanis was a convicted felon with a reputation for looting public companies.

41.     The article claimed that (a) COR, which Banc acknowledged in its SEC filings was controlled by Sugarman, was actually controlled by Galanis; (b) Prospect Global, which was affiliated with Brownstein, was funneled money from one of Galanis's frauds; and (c) Camden Capital, which was affiliated with Seabold, was used to fund another one Galanis's frauds.

42.     Banc shares fell $4.61 per share, or 29 percent, the day this news was reported by *SeekingAlpha*.com. In response to these allegations, Banc issued a press release the same day stating:

> Banc of California, Inc. today announced it is aware of allegations posted in a financial blog. The Company's Board of Directors has been aware of matters relating to Jason Galanis including certain claims he had made suggesting an affiliation with members of the Company, its Board, and/or its Executive team. The Board, acting through its Disinterested Directors, immediately initiated a thorough independent investigation led by Winston & Strawn, and has received regular reports including

related to regulatory and governmental communications over the past year.

43.    On October 19, 2016, the Company filed a Form 8-K with the SEC, which attached a copy of the October 18 press release. On an analyst conference call held that same day, Banc's General Counsel, non-party John Grosvenor ("Grosvenor"), reaffirmed the statements contained in the Company's press release denying any connection with Galanis. Specifically, Grosvenor provided the following description of the Board's role in the prior investigation:

> As discussed in our press release yesterday, management first advised the Board of Directors in 2015 regarding the facts then known pertaining to the circumstances associated with Jason Galanis's indictment, including certain claims attributed to Galanis that he was affiliated in some manner with the Company or members of the Company's Board of Directors or management.
>
> In response, ***the Board of Directors determined to retain outside counsel to independently investigate the matters raised and report any information*** that might indicate the possible existence of any potential impropriety. The results of that investigation, which has continued over the course of more than a year, failed to disclose any ownership interest by Galanis in the Company or the bank, and affirmatively confirmed that he exercised no direct or indirect control over the Company or the bank or any entity owned or affiliated with Steven Sugarman or any other member of the Board of Directors.
>
> The investigation also failed to disclose any past or present lending relationship between Galanis and the bank. In fact, the inquiry disclosed instances in which attempts by Galanis to establish a business relationship with the Company, presumably in furtherance of the fraudulent schemes for which he subsequently pled guilty, were unsuccessful.

In that regard, the Company shared information developed in the course of its own investigation in cooperation with the government's prosecution of Galanis and others. That cooperation is evidenced by, among other matters, Paragraphs 40 and 41 contained in the affidavit submitted by the FBI's special agent in charge of the government's investigation as recited in the letter of Company counsel. As has been made clear, at least by reputable news organizations, none of the Company or the bank or any member of the Board of Directors or management has been the subject of the government's prosecution of Galanis.

Finally, in response to the allegations contained in the Seeking Alpha post and at the direction of the disinterested members of the Board, Company counsel has made written demand, a copy of which is included in our filing this morning, for the immediate removal and a written retraction of the article. In addition, the Company has been advised by its counsel that the demonstrably egregious nature of the defamatory statements constitutes actionable libel per se, and the Company intends to vigorously pursue all of its legal remedies.

As a result, on the advice of counsel and in order to preserve our rights, we are not going to discuss any further specifics about Galanis during today's call while our formal demands for removal and a retraction of the article are pending. We will provide periodic public updates and further information as additional developments occur.

44.     On October 27, 2016, Banc's independent auditor KPMG sent Defendant Sznewajs a letter "raising concerns about allegations of 'inappropriate relationships with third parties' and 'potentially undisclosed related party relationships.'" That same day, the Company formed a Special Committee of purportedly independent directors to further investigate the allegations raised in

the *SeekingAlpha* report. The Special Committee consisted of Defendants Schnel, Karish, Benett, and Sznewajs, along with non-party Holoman.

45.    On November 10, 2016, the Company filed a notice with the SEC stating:

> [The Company] is delaying the filing of its Quarterly Report on Form 10-K for the fiscal quarter ended September 30, 2016 . . . at this time to allow for completion of a review into certain purported improper relationships and related party transactions and related matters. The review includes an investigation by independent legal counsel having no prior relationship with the Company or its officers and directors under the direction of a Special Committee of Independent Directors, which was established by the Board of Directors on October 27, 2016.

46.    On January 23, 2017, Banc issued a press release disclosing that the Company's October 18, 2016 press release denying the Galanis allegations had contained false statements, and that the SEC had commenced an investigation into those statements. In relevant part, the press release stated:

> On October 18, 2016, an anonymous blog post raised questions about related party transactions and other issues with respect to the Company. As previously disclosed, in response to these allegations, the Board formed a Special Committee which commenced a process to review the allegations. Shortly thereafter, on October 27, 2016, the Company's independent auditor, KPMG, sent a letter to Mr. Sznewajs in his capacity as Chair of the Company's Joint Audit Committee (the "KPMG Letter") raising concerns about allegations of "inappropriate relationships with third parties" and "potential undisclosed related party relationships."

On October 30, 2016, the Special Committee retained WilmerHale, a law firm with no prior relationship with the Company, to conduct an independent investigation to address certain issues raised by the blog post, as well as questions raised by the KPMG Letter. In accordance with the KPMG Letter, WilmerHale will make a final report to the Special Committee and KPMG on the results of its investigation. The Special Committee expects that this final report will take place within weeks.

While certain work remains to be completed, to date WilmerHale's inquiry has not found any violation of law. In addition, contrary to the claims in the blog post, the inquiry has not found evidence that Jason Galanis has any direct or indirect control or undue influence over the Company. Furthermore, the inquiry has not found evidence establishing that any loan, related party transaction, or any other circumstance has impaired the independence of any director.

Through the inquiry, however, the Special Committee has determined that a press release issued on October 18, 2016 contained inaccurate statements. In that press release, the Company stated that the "Board of Directors, acting through its Disinterested Directors" had, as of October 18, 2016, investigated issues raised in the blog post. This press release was inaccurate in certain respects. The review established that although an investigation had been conducted, it was not initiated by the Board of Directors; rather, it appears to have been directed by Company management rather than any subset of independent directors. In addition, the press release characterized the investigation as "independent" without disclosing that the law firm conducting the investigation had previously represented both the Company and the Company's CEO individually. Furthermore, the press release stated that the Board or a group of "Disinterested Directors" had received "regular reports including related to regulatory and governmental

communications." This overstated both the degree to which the Company had been in contact with regulatory agencies about the subject matter referenced in the blog post, as well as the involvement of the directors in oversight or direction of the inquiry.

Related to this matter, on January 12, 2017, the Securities and Exchange Commission ("SEC") issued a formal order of investigation directed at certain of the issues that the Special Committee is reviewing. Also on January 12, 2017, the SEC issued a subpoena seeking certain documents from the Company, primarily relating to the October 18, 2016 press release and associated public statements. The Company intends to fully cooperate with the SEC; in addition, the Special Committee will share the results of its review with the SEC staff.

47.     In a separate press release issued the same day, Banc announced Sugarman's resignation from all positions with the Company. He was replaced as Chairman by Defendant Sznewajs, and the Company announced a convoluted interim executive structure, as follows:

The Office of the CEO/President will be composed of Hugh Boyle, Chief Risk Officer, who will additionally assume the title of Interim Chief Executive Officer, and J. Francisco A. Turner, Chief Strategy Officer and Principal Financial Officer. Mr. Turner will partner with Mr. Boyle and assume the title of Interim Chief Financial Officer and President.

48.     On this news, Banc's shares fell $1.50, or nearly 10 percent.

49.     With Sugarman's exit and the appointment of a new slate of senior executives, Defendants Schnel, Sznewajs, Benett, and Karish were now effectively in control of the Company. Sugarman had led Banc's turnaround since 2010, but within months, many of the remaining personnel who had worked with him to build the Company's operations would depart.

50. On February 7, 2017, the Company announced that Brownstein was retiring as a director of Banc, leaving just the Individual Defendants and Holoman on the Board. On the same day, Banc separately announced that Defendant Benett, who previously decided not to stand for reelection to the Board, had "reconsidered this decision, and wishes to stand for re-election."

51. On February 9, 2017, the Company issued a press release announcing that "WilmerHale has made a final report to the Special Committee . . . and has confirmed its earlier conclusion that the inquiry has not found any violation of law." The investigation concluded that Galanis had no indirect or direct control or undue influence over the Company and that no loans or related party transactions had impaired the independence of any director.

52. On or around March 13, 2017, Seabold was involuntarily placed on indefinite Administrative Leave. On April 4, 2017, Banc announced non-party Holoman had declined to stand for reelection and would depart the Board effective at the end of the Company's upcoming annual meeting on June 9, 2017.

**C. Seabold's Wrongful Termination Lawsuit.**

53. On September 5, 2017, Seabold, Banc's former Executive Vice Chairman, sued Banc in Los Angeles Superior Court, Case No. BC 674694, for wrongful discharge in violation of public policy and breach of contract, among other things. Seabold accuses Banc of wrongful termination and alleges a scheme executed by the Individual Defendants to avoid the consequences of their own misconduct and conflicts of interest, entrench themselves and their cronies on Banc's Board, and eliminate anyone standing in their way.

54. Seabold alleges that Benett, Karish, Sznewajs, and Schnel, each with Banc since at least 2013, took advantage of the Galanis allegations to force out Banc's founders, whistleblowers, and any others who attempted to ensure Banc complied with its disclosure and financial reporting obligations. According to Seabold, the Individual Defendants each suffered from actual, undisclosed

conflicts of interest, but were able to misuse the Special Committee to divert attention away from their own misconduct and secure control of Banc.

55.     According to Seabold, the Individual Defendants, along with the newly installed management, even went so far as to manipulate financial results for the first quarter of 2017.

56.     Seabold alleges that as Sugarman, Brownstein, and Seabold became the targets of the Special Committee's investigation, Sugarman expressed his concerns to Defendant Schnel that Defendant Benett had himself been violating the Banc's corporate opportunities and conflict of interest policies, and suffered from his own undisclosed conflicts of interest. According to Seabold, Defendant Benett's conflicts extended back to 2014, when he was employed by KBW, Inc., an investment banking firm, which did work with Banc and its competitors, a relationship which should have been disclosed.

57.     Seabold alleges that the Nominating and Governance Committee, of which Schnel was a member, failed to take any action against Benett because, according to Seabold, Karish was involved in similar related party transactions. According to Seabold, Defendant Benett had agreed not to stand for reelection to Banc's Board in an attempt to allay Sugarman's concerns about Benett's conflicts of interest, but that in reality had never intended to do so.

58.     Seabold alleges that Defendant Karish also suffered from undisclosed conflicts of interest. According to Seabold, Defendant Karish was employed by Heritage Group, a large investor in a separate business owned by Brownstein.

59.     Seabold also alleges that Karish served on the board of another public company previously accused on *SeekingAlpha* of fraudulent business practices, something Karish never revealed to the Board. Seabold alleges that following the Galanis post, tipsters contacted Banc to alert the Board that Karish had been accused of breaching his fiduciary duties in a prior case and had used the "investigation" of those allegations to entrench himself. Seabold further alleges

that Banc employees responsible for compliance insisted that Karish be reviewed for conflicts of interest, but that Karish had refused. Seabold claims that those Banc employees who insisted on the review no longer work for Banc.

60.     Seabold also claims that Defendant Sznewajs was likewise involved in undisclosed self-dealing. According to Seabold, Defendant Sznewajs never disclosed that he, as Chairman of the Audit Committee, had approved hiring his son's firm to underwrite an offering by Banc.

61.     Seabold's complaint provides detailed allegations about how the members of the Special Committee advanced their own personal interests by targeting longtime Banc employees and Board members for removal. Despite never uncovering evidence of any improper relationships between Banc and Galanis, Defendants Benett, Karish, Sznewajs, and Schnel successfully manipulated the Special Committee to achieve their goal of removing Sugarman and others from the Company and assuming control.

62.     Seabold also alleges that as part of the scheme, Banc's management, with apparent approval of the Audit Committee, artificially inflated Banc's first quarter 2017 financial results.  According to Seabold, shortly after the Individual Defendants' "power grab," it became apparent as early as January 2017 that Banc would fall short of consensus operating results for the first quarter 2017.

63.     During this period, Seabold alleges firsthand communication with Banc's Interim CEO who stated that the Company was going to miss consensus earnings estimates and needed to generate revenue to cover the shortfall. Seabold alleges that shortfall was either known to the Audit Committee or recklessly disregarded by it. Yet the Company continued to provide the market with public guidance that Banc would achieve $2.00 earnings per share (EPS) for the year.

64.     Seabold alleges that Banc's new leadership refused to cut guidance and risk exposing their unlawful acts and self-dealing. Instead, they chose to

1   manufacture earnings by causing Banc to improperly reverse bonus accruals to

2   appear more profitable.

3       65.    To implement this plan, Banc's new leadership eliminated the

4   standard transparency from the financial reporting and budgeting processes and

5   even turned off the SOX compliance reports that went out to management. They

6   then initiated a so-called "reassessment" for accruals for 2016 bonuses. This

7   resulted in reversing $7.8 million in accruals, which were then credited toward

8   liabilities accrued in the first quarter 2017. There was no legitimate reason to

9   reverse these accruals. It also resulted in earned, guaranteed performance-based

10   bonuses not being paid to Seabold and others, despite Banc's obligation to do so.

11       66.    It is basic accounting that revenues generated in one fiscal year cannot

12   be carried over to another. Those bonus accruals were recognized in 2016, and to

13   "reassess" them for purposes of first quarter 2017 earnings was improper and

14   painted a misleading picture of Banc's continued operating EPS for that period.

15       67.    Seabold also alleges that there are presently significant material

16   weaknesses in Banc's internal controls. Banc's most recent Form 10-K

17   acknowledged that its independent auditor, KPMG, reported a material weakness

18   in Banc's internal controls over financial reporting. Defendant Sznewajs, who

19   served as Chairperson of the Audit Committee overseeing Banc's faulty financial

20   reporting, is now Chairperson of the Board despite failing to correct the material

21   weaknesses identified by KPMG.

22       68.    Finally, Seabold alleges that the Individual Defendants sought to

23   blame Banc's departed executives for the material weakness in Banc's internal

24   controls over financial reporting. Seabold alleges that Banc sought to blame him

25   and others by stating in the same Form 10-K that the Company had been suffering

26   from a "tone at the top" that did not prioritize "internal control over financial

27   reporting." Seabold alleges that the three individuals in fact most responsible for

28   the material weakness identified by KPMG (Hugh Boyle, Defendant Sznewajs,

and Francisco Turner) not only were not disciplined but were *promoted* to top positions at Banc.

## DAMAGES TO THE COMPANY

69.     Banc has suffered, and continues to suffer, from the Individual Defendants' wrongdoing described herein.

70.     As a result of the Individual Defendants' improprieties, Banc disseminated the October 18, 2016 press release falsely describing the Company's process regarding the Galanis investigation. This false statement, which was made by the Individual Defendants, or made in their name, and which they failed to timely retract or correct, directly caused the SEC investigation, a highly damaging event for a public company like Banc.

71.     Furthermore, the Special Committee's investigation into the allegations of improper relationships and related party transactions was structurally flawed, as it was conducted by a set of conflicted directors, and failed to provide Banc and its shareholders with an independent review of the matters at issue. To the contrary, the Special Committee's investigation served to entrench directors with their own undisclosed conflicts of interest and damaging the franchise, as alleged herein.

72.     The Individual Defendants' improper statements, and the Special Committee's flawed response to the allegations of impropriety, have devastated Banc's credibility, as reflected by the significant loss of market capitalization suffered by the Company.

73.     Furthermore, as a direct and proximate result of the Individual Defendants' actions, Banc has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to: (a) costs incurred from repeatedly investigating the allegations of wrongdoing; (b) costs incurred from responding to the ongoing SEC investigation, and (c) costs incurred defending and settling other related claims.

74.    Plaintiff seeks to remedy the foregoing harm through the recovery of monetary damages and implementation of corporate governance reforms.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.    Banc is named as a nominal defendant solely in a derivative capacity.

76.    This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.    Plaintiff will adequately and fairly represent the interests of Banc in enforcing and prosecuting its rights and has hired experienced counsel.

78.    Plaintiff was a shareholder of Banc at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is currently a Banc shareholder.

79.    Plaintiff did not make a demand on the Board to institute this action because the delay in waiting for a response to the demand would cause irreparable harm to the corporation. As alleged herein, the Board is composed of entrenched directors who have exposed the Company to massive liability and otherwise prioritized their interests over the Company and the shareholders, and who have otherwise failed to ensure that the Company is in compliance with applicable law.

80.    Plaintiff did not make a demand on the Board to institute this action because such a demand would be futile.

81.    A majority of the directors are so personally and directly conflicted or committed to the issues in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

82.    Banc is controlled by its Board, which currently has nine (9) members, all of whom are disqualified from considering a demand.

83.    The Board consists of the Individual Defendants, and five (5) non-party directors: Lashley, Hill, Douglas Bowers ("Bowers"), Mary Curran ("Curran"), and W. Kirk Wycoff ("Wycoff").

84.     <u>The Individual Defendants</u>: Demand upon the Individual Defendants (Benett, Karish, Sznewajs, and Schnel) is excused. Each served as a director on October 18, 2016, the date that Banc issued a press release stating that the Board had initiated an "independent" investigation of the Galanis allegations, and had received "regular reports" on the investigation. These statements, made in the name of the Board, were patently false, yet the Individual Defendants never corrected nor retracted them. In addition, each served as a director on October 19, 2016, the date that Banc General Counsel Grosvenor reaffirmed these statements in a conference call with analysts. Again, these statements were patently false, yet the Individual Defendants never corrected nor retracted them. These fiduciary breaches led directly to the disastrous SEC investigation.

85.     Furthermore, each served as a member of Banc's Special Committee charged with investigating, among other things, the allegations in the October 18, 2016 *SeekingAlpha*.com blog post. As members of the Special Committee, the Individual Defendants breached their fiduciary duties by, among other things, wrongfully entrenching themselves on the Board, and failing to act independently in the face of a known duties to act to protect the Company. These defendants would never conduct an independent investigation into Plaintiff's allegations because to do so would expose their own wrongdoing.

86.     The Individual Defendants' actions constitute bad faith breaches of fiduciary duty, and they face a substantial likelihood of liability.

87.     <u>Bowers</u>: Demand upon Bowers would be futile because he lacks independence. Banc's 2017 Proxy Statement admits that Bowers is not independent. As the current CEO of the Company, Bowers does not satisfy NYSE director independence standards because he derives his principal income from Banc, including material salary and cash and equity retention awards.

88.     On April 24, 2017, Bowers entered an Employment Agreement with Banc.  Bowers employment began on May 8, 2017.  Bower's employment agreement provides that he will be paid the following compensation:

- $700,000 per year from May 8, 2017 to April 30, 2018;
- $725,000 per year from May 1, 2018 to April 30, 2019;
- $750,000 per year from May 1, 2019 to April  30, 2020; and
- After April 30, 2020, at a rate to be determined by the Compensation Committee.

89.     Bowers is also eligible for a Target Bonus up to 100% of his base salary, with an Annual Bonus of between 0% and 150% of his base salary per year. The bonus amount will be determined by the Compensation Committee. Bower's employment contract also provides for participation in the Company's stock incentive program, among other employment consideration.

90.     Bower's employment contract provides that he "shall report directly to the Board" and can be terminated from his position with the Company for cause for failure to comply with directives from the Board.

91.     Currently, Defendant Karish chairs the Compensation Committee, and Defendant Sznewajs is a member, along with non-party directors Hill and Wycoff.  Bowers is thus unable to investigate a demand against Defendants Karish or Sznewajs in a disinterested and independent manner because he is beholden to them for his compensation.

92.     When Bowers joined the Company's Board in April 2017, Defendant Sznewajs stated: "We are pleased to welcome Doug to Banc of California. The Board conducted an extensive search and is confident Mr. Bowers has the right banking expertise and leadership skills to lead the Company. His industry experience, operational know-how and commitment to community values will be invaluable in continuing our mission."

93.     At the time he joined Banc, Bowers stated, "I look forward to leading this team of talented bankers and see great opportunities for the bank as it optimizes its focus on commercial banking and continues to grow scalable products and solutions for California's businesses and entrepreneurs. I am eager to begin work with our Board, senior management and employees as we plan and execute the path forward on behalf of all of our stakeholders."

94.     Under these circumstances, Bowers would never act contrary to the interests of Defendant Sznewajs and the other directors, excusing demand.

95.     <u>Lashley</u>: Demand upon Lashley would be futile because of his alleged knowledge of the accounting manipulations alleged by Seabold. According to Seabold, there is a "recorded conversation" of a whistleblower describing accounting manipulations to Banc's Head of Internal Audit and Lashley, yet the whistleblower's allegations were dismissed. Lashley could never act to protect the Company's interests in a disinterested fashion under these circumstances, and demand on him is therefore excused.

96.     <u>All Directors</u>: By order dated September 6, 2017, U.S. District Judge Andrew Guilford upheld allegations of securities fraud against Banc in the pending federal securities class action. The securities class action alleges that Banc made false and misleading statements to the market regarding issues related to Galanis. Because of the overlapping subject matter of both cases, if the Company pressed forward with its claims against the defendants in this case, then the Company's efforts could undercut or even compromise the defense of the securities class action. Demand is further excused because, although Banc has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, the Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Banc any part of the damages suffered thereby.

**CLAIM FOR RELIEF**

**Against the Individual Defendants for Breach of Fiduciary Duty**

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

98.     The Individual Defendants, by reason of their positions as directors of Banc and because of their ability to control the business and corporate affairs of Banc, owed to Banc obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Banc in a fair, just, honest, and equitable manner.

99.     The Individual Defendants acted in bad faith and in breach of their duty of loyalty, including by failing to act in the face of a known duty to act, demonstrating a conscious disregard for those duties.

100.   As a direct and proximate result of the breaches of fiduciary obligations by the Individual Defendants, Banc has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

101.   The Individual Defendants' misconduct – through both their actions and conscious inaction – cannot be exculpated under Maryland or other applicable law as it implicates bad faith and a breach of the duty of loyalty.

102.   Plaintiff, on behalf of Banc, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Banc, demands judgment as follows:

A.     Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Banc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Banc and its shareholders from a repeat

of the damaging events described herein, including, but not limited to, adopting corporate governance policies to: (a) strengthen the Company's controls over financial reporting; (b) strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (c) strengthen Banc oversight of its disclosure procedures; (d) prevent self-dealing and related party transactions and Board entrenchment;

C. Determining and awarding Banc the damages it sustained as a result of the violations set forth above and restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D. Granting extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

E. Determining and awarding Banc the damages sustained by it as a result of the Individual Defendants' breaches of fiduciary duties, as set forth above, from each of the Individual Defendants, jointly and severally, together with interest thereon; and

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable fees and costs to Plaintiff's attorneys, accountants, and experts.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 26, 2017

By: */s/ Willem F. Jonckheer*
ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:   (415) 788-4220
Facsimile:   (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law

COREY D. HOLZER
MARSHALL P. DEES
**HOLZER & HOLZER**
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone:   (770) 392-0090
Facsimile:   (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Counsel for Plaintiff*

VERIFICATION


I, Kristopher Gordon, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.




*Kristopher Gordon*

_____
Kristopher Gordon



Executed on this 26th day of September, 2017 in Atlanta, Georgia.