ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:  (415) 788-4220
Facsimile:   (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law

*Counsel for Plaintiff*

*[Additional Counsel Appear on Signature Page]*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTOPHER GORDON, | **No. 8:17-CV-1678-CJC-DFM** |
| Plaintiff, | **VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| ROBERT D. SZNEWAJS; HALLE J. BENETT; JONAH SCHNEL; JEFFREY KARISH; JOHN GROSVENOR; RICHARD J. LASHLEY; and DOUGLAS H. BOWERS, | Jury Trial Demanded |
| Defendants, | |
| -and- | |
| BANC OF CALIFORNIA, INC. | |
| Nominal Defendant. | |

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Kristopher Gordon ("Plaintiff") brings this shareholder derivative action on behalf of nominal defendant Banc of California, Inc. ("Banc" or the "Company"), a Maryland corporation. The allegations in this Complaint are based upon personal knowledge as to Plaintiff and on information and belief as to all other matters. Plaintiff's information and belief is based upon the investigation conducted by and under the supervision of counsel which included, among other things, consultation with an accounting expert and a review and analysis of: (a) the Banc's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) articles in the news media and analyst reports; (c) the Company's website and press releases; (d) complaints and related materials in litigation commenced against the Company, including, without limitation, *In re Banc of California Securities Litigation*, Docket No. 8:17-cv-00188-AJG (C.D. Cal. Jan. 23, 2017) (the "Securities Class Action"), *Salas v. Banc of California,* Case No. BC 672208 (Cal. Los Angeles Super. Ct. August 11, 2017), *Seabold v. Banc of California*, Case No. BC-674694 (Cal. Los Angeles Super. Ct. September 5, 2017), and *Endresen v. Banc of California,* Case No. BC-685641 (Cal. Los Angeles Super. Ct. December 7, 2017); and (e) applicable rules and regulations.

## NATURE OF THE ACTION

1.      Banc is a financial institution serving clients in California and the Western United States. On October 18, 2016, a post on *SeekingAlpha* entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible" alleges a web of improper and dangerous relationships between Jason Galanis ("Galanis"), a Los Angeles financier and convicted securities fraudster, and some of Banc's senior managers, including Steven Sugarman ("Sugarman"), then Banc's Chief Executive Officer ("CEO"), and Chad Brownstein ("Brownstein"), then Banc's Lead Independent Director (the "Aurelius Blog").

2.      Banc publicly responded to the Aurelius Blog the same day, stating in a press release that it had been aware of the Galanis allegations for some time,

1   but that Banc's Board, acting through "disinterested directors," had already
2   conducted an "independent" investigation of the matter "led by Winston &
3   Strawn," a law firm, and had received "regular reports" regarding the investigation.

4        3.    Banc's press release went on to discredit the allegations in the
5   Aurelius Blog and denied the existence of ties between Galanis and Banc. On
6   October 19, 2016, these denials were repeated and reinforced by Banc's General
7   Counsel John Grosvenor ("Grosvenor") in an investor conference call, in which he
8   stated that, after becoming aware of the issue in 2015, "the Board, acting through
9   its Disinterested Directors, immediately initiated a thorough independent
10  investigation" of the Galanis allegations, and that the Board had received "regular
11  reports" from Winston & Strawn along the way. In addition, the October 18, 2016
12  press release was attached to a Form 8-K filed by Banc with the SEC on October
13  19, 2016, signed by Grosvenor.

14       4.    On or about October 27, 2016, Banc received an inquiry from its
15  auditor, KMPG, raising questions about the potential involvement of Galanis in
16  Banc's finances and operations, and the Company's response to the allegations in
17  the Aurelius Blog. The Board created a Special Committee to investigate the
18  alleges improper relationships and transactions.

19       5.    The Special Committee included four board members who were
20  themselves mentioned in the Aurelius Blog as having undisclosed conflicts of
21  interest or other questionable associations. Sugarman and Brownstein were
22  excluded from the Special Committee.

23       6.    As alleged herein, several former Banc employees publicly claim that
24  the Special Committee undertook a limited investigation into certain Banc insiders,
25  while declining to consider disqualifying conflicts of interest involving
26  themselves.

27       7.    On January 23, 2017, Banc reported the Special Committee's
28  conclusion that the Galanis allegations in the Aurelius Blog were false. However,

the Special Committee also reported that the October 18, 2016 press release *itself* was false. Specifically, the Special Committee revealed that Winston & Strawn's earlier investigation was not directed by "disinterested" board members, but by "management," that Winston & Strawn was not "independent," having previously represented Banc and Sugarman personally, and that the Board had not received "regular reports" of the investigation at all.

8.     Banc also disclosed that its admittedly false October 18, 2016 response to Aurelius Blog post had triggered an SEC investigation, which remains ongoing more than a year later. That SEC investigation is captioned *In the Matter of Banc of California NY-09592*. Although the Galanis allegations were allegedly discredited, Sugarman and Brownstein were promptly forced out of the Company, along with several other top executives.

9.     In the wake of the investigation, the members of Special Committee were able to secure control of Banc. Several former top executives who have since filed suit against the Company, including former Executive Vice Chairman, Jeffrey T. Seabold ("Seabold"), former Executive Vice President and Chief of Staff, Carlos P. Salas ("Salas"), and former Managing Director of SBA (Small Business Administration) Lending, Heather Endresen ("Endresen"), allege that the Special Committee members charged with independently investigating the claims of related party transactions and self-dealing had not done so in good faith, but rather had "scapegoated" Sugarman, Brownstein, and others as part of a "power grab" to conceal their own improper conduct, relationships and transactions. Sugarman filed a sworn declaration to this effect in the Securities Class Action, as alleged below.

10.     As Banc struggled with the fallout from the Aurelius Blog in early 2017, Banc, with the approval of the Company's Audit Committee, manipulated first quarter 2017 earnings per share (EPS) to meet earnings guidance, and to maintain the appearance of Banc's financial success. Banc improperly reversed

certain accrued liabilities for employee bonuses earned in 2016, and improperly boosted reported financial results for the first quarter of 2017. As alleged herein, Banc's financial statements for fiscal year 2016 and the first quarter of 2017 as filed with the SEC were not in conformity Generally Accepted Accounting Principles ("GAAP").

11.     A majority of Banc's current directors have breached their duties to the Company in connection with the unfolding scandal at Banc. First, these directors authorized, endorsed, and/or failed to immediately correct the Company's false October 18, 2016 press release and October 19, 2016 statements issued by and on behalf of the Board, directly causing the SEC investigation. Second, the Special Committee was composed of conflicted directors motivated to take control of the Company, whose conduct has entrenched the wrongdoers and further jeopardized the Company. Third, Banc has engaged in accounting manipulations with the knowledge of the Audit Committee, specifically designed to inflate results for the first quarter of 2017, and filed false and misleading financial statements.

12.     These actions have severely damaged Banc. Since the Aurelius Blog posting, Banc has been plunged into chaos as a direct result of Defendants' misconduct, including the active SEC investigation they precipitated, the issuance by Banc of false and misleading financial statements for fiscal year 2016 and the first quarter of 2017, and multiple lawsuits by former top executives alleging rampant conflicts of interest, violations of law, and internal control breakdowns. Furthermore, Banc has now admitted in its Form 10-K for 2016, filed on March 1, 2017, that it suffers from material weaknesses of its internal controls, which weaknesses were, at all relevant times, the direct responsibility of the Board.

13.     Plaintiff brings this suit derivatively on Banc's behalf to remedy the misconduct by certain of the officers and directors, and seeks redress for breaches of their fiduciary duties of loyalty, good faith, and due care.

14. A demand to bring the claims is excused for futility under Maryland law, because (a) the Company faces the prospect of irreparable harm absent shareholder action; and (b) a majority of the directors are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith, and within the ambit of the business judgment rule.

15. As alleged below, Banc's directors have already been provided with the opportunity to remedy each instance of their alleged malfeasance, but in each case, a majority placed their own personal interests above the Company, simply proceeded with the unlawful conduct, and did nothing to enforce Banc's rights.

16. Banc's shareholders have been denied the benefits of loyal management by its current and former executives and directors. As described more fully below, Banc and its shareholders are entitled to monetary and injunctive relief to redress the Individual Defendants' bad faith conduct.

## JURISDICTION AND VENUE

17. Banc is a corporation that conducts business and maintains its executive headquarters in this District. The Individual Defendants have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18. Jurisdiction is based on 28 U.S.C. § 1332(a)(2), there being diversity of citizenship between Plaintiff and Defendants because Plaintiff, on the one hand, and the Defendants, on the other, are citizens of different states. The amount in controversy exceeds $75,000, exclusive of interest and costs.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) and (d). Further, a substantial portion of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

# THE PARTIES

20.     Plaintiff Kristopher Gordon ("Gordon") has held shares of Banc stock continuously since September 2016 and is a current Banc shareholder. Plaintiff is a citizen of Georgia.

21.     Nominal defendant Banc is a Maryland corporation with its principal executive offices located at 3 MacArthur Place, Santa Ana, California 92707. Banc common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BANC." Banc is a citizen of California.

22.     Defendant Robert D. Sznewajs ("Sznewajs") was appointed as Chair of the Board of Directors in January 2017 after having served as a director since 2013. Defendant Sznewajs serves as a Board designated "financial expert" and is a member of Banc's Audit Committee and Compensation and Human Capital Committee (the "Compensation Committee"). For 2016, Sznewajs received $257,419 in fees, stock awards, and compensation from the Company. Sznewajs is a citizen of California.

23.     Defendant Halle J. Benett ("Benett") has been a director of the Company since December 2013. Defendant Benett serves on Banc's Audit Committee and Nominating and Corporate Governance Committee. For 2016, Benett received $230,033 in fees, stock awards, and compensation from the Company. Benett is a citizen of California.

24.     Defendant Jonah F. Schnel ("Schnel") has been a director of the Company since 2013. Defendant Schnel is a member of the Nominating and Governance Committee. For 2016, Schnel received $333,650 in fees, stock awards, and compensation from the Company. Schnel is a citizen of California.

25.     Defendant Jeffrey Karish ("Karish") has been a director of the Company since 2011. Defendant Karish serves on Banc's Audit Committee and the Compensation Committee. For 2016, Karish received $214,528 in fees, stock awards, and compensation from the Company. Karish is a citizen of California.

26.     Defendant Richard J. Lashley ("Lashley") has been a director of the Company since February 16, 2017.  Defendant Lashley is, and at all relevant times has been, a member of the Audit Committee and the Nominating and Corporate Governance Committee. Lashley is co-founder of PL Capital Advisors, which owned 3,427,219 shares of Banc's common stock as of 2017. Lashley receives cash and stock compensation as a director of Banc. Lashley is a citizen of California.

27.     Defendant Douglas H. Bowers ("Bowers") has been the CEO and a director of the Company since on or about May 8, 2017. Bowers' salary for the first year of his employment is $700,000, with eligibility for a substantial bonus, as alleged herein. Bowers is a citizen of California.

28.     Defendant Grosvenor has been Banc's General Counsel and Corporate Secretary since August 2012. For 2016, Grosvenor received $1,100,046 in total compensation from the Company. Grosvenor is a citizen of California.

29.     Defendants Sznewajs, Benett, Schnel, Karish, Lashley and Bowers are sometimes collectively referred to herein as the "Director Defendants." Defendant Grosvenor and the Director Defendants are sometimes referred to as the "Individual Defendants."

## BOARD AND OFFICER DUTIES

**Duties of the Individual Defendants**

30.     Under Maryland law, each Defendant owed and owe Banc and its shareholders fiduciary obligations and due care. Each defendant was and is required to act in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. Maryland law defines "act" to include an act, an omission, a failure to act, or a determination made not to act.

31.     To discharge their duties, Banc's officers and directors were required to exercise reasonable and prudent supervision over the management, policies,

practices, and controls of the Company.  By virtue of such duties, the officers and directors of Banc were required to ensure the Company complied with its legal obligations and requirements, including complying with regulatory requirements by devising and implementing a system of internal controls sufficient to ensure the accuracy of Banc's financial statements and reporting

32.     Banc's officers and director were required to remain informed as to how Banc conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices as necessary to comply with applicable laws.

33.     At relevant times, the Audit Committee of the Board was comprised of Defendants Benett, Karish, Sznewajs, and Lashley, with Lashley as Chairman.

34.     The Audit Committee is responsible for monitoring and oversight of the integrity of the Company's financial statements and financial accounting practices, the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, the effectiveness of the Company's internal controls over financial reporting, and the Company's compliance with legal and regulatory requirements.

35.     According to its Charter, the Audit Committee is to be comprised of at least three members appointed by the Board who meet the independence and other requirements of the NYSE.

36.     The members of the Audit Committee are appointed by the Board on recommendation of the Nominating and Governance Committee.

## RELEVANT FACTUAL ALLEGATIONS

### A.     Background.

37.     In 2010, Banc's predecessor entity, First PacTrust, was struggling in the post-recession economy. COR Capital LLC ("COR") stepped forward and

helped contribute $60 million to revitalize the bank. COR was owned and managed by Sugarman, who joined First PacTrust's Board of Directors.  On September 21, 2012, Sugarman became First PacTrust's CEO.

38.    In July 2013, First PacTrust renamed itself Banc of California and promoted itself as a "community investment leader." Banc has experienced phenomenal growth since 2010 as its assets have grown to more than $10 billion.

39.    As of April 15, 2016, the Banc's Board consisted of seven (7) directors: Defendants Schnel, Benett, Sznewajs, and Karish, along with non-parties Sugarman, Brownstein, and Eric Holoman ("Holoman").

40.    Banc's 2016 Proxy Statement included a statement that the Company's Nomination and Corporate Governance Committee had conducted its annual review of "all relationships between the Company and each Director and Nominee and has affirmatively determined that, with the exception of Mr. Sugarman, who is a Company employee, each non-employee director . . . has only immaterial relationships with the Company, and accordingly each has been determined to be independent under these standards."

41.    According to the 2016 Proxy Statement, the Board also concluded that all members of the Audit Committee and Nominating and Corporate Governance Committee were independent, as that term is defined by the NYSE standards and the Company's Corporate Governance Guidelines.

42.    In reality, a tangled web of related party transactions and undisclosed financial relationships would embroil Banc in a controversy that continues to threaten the Company.

**B.    The Aurelius Blog.**

43.    On October 18, 2016, *SeekingAlpha*.com published the Aurelius Blog entitled "BANC: Extensive Ties To Notorious Fraudster Jason Galanis Make Shares Un-Investable," written by an anonymous blogger known as Aurelius. It claimed, among other things, that Banc directors Sugarman and Brownstein, along

1    with top executive Seabold, had certain ties to Galanis. Galanis was a convicted
2    felon with a reputation for looting public companies.

3        44.    The Aurelius Blog described Galanis's history of criminal conduct
4    and provided links to source documents that included SEC complaints and criminal
5    indictments. Specifically, the Aurelius Blog alleges how, on September 24, 2015,
6    the United States Department of Justice ("DOJ") and the SEC charged Galanis
7    with orchestrating multiple schemes to defraud investors.

8        45.    The Aurelius Blog alleges how, from 2009 to 2011, Galanis and
9    others engaged in a scheme to defraud the shareholders of a publicly-traded
10   company called Gerova Financial Group, Ltd. ("Gerova") by obtaining secret
11   control over millions of shares of stock and then manipulating the market for the
12   stock as the defendants caused their secretly held shares to be sold.

13       46.    As part of the scheme, Galanis fraudulently generated demand for
14   Gerova stock by bribing investment advisers to purchase for client accounts the
15   Gerova stock that was sold by Galanis and others, thereby enabling Galanis to cash
16   out from the scheme and make millions in illegal profits.

17       47.    Galanis pled guilty to these charges in July 2016 and was sentenced
18   to a six-year prison term in February 2017.

19       48.    In May 2016, while he was out on bail for the Gerova fraud, the DOJ
20   and SEC again charged Galanis with securities fraud, this time in connection with
21   a Ponzi scheme to defraud investors and a Native American tribal entity of tens of
22   millions of dollars ("Tribal Bond Scheme").

23       49.    Galanis and other co-conspirators allegedly induced a Native
24   American tribal entity to issue bonds based on lies about how the bond proceeds
25   would be invested. Galanis and the others pocketed the proceeds. Galanis also
26   allegedly defrauded investors into buying the bonds by hiding material facts.
27   Galanis pled guilty to the Tribal Bond Scheme in January 2017.

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

50.     The Aurelius Blog alleges that Sugarman's COR and Galanis controlled the same offshore insurance company, Valor Group ("Valor"), a Bermuda based holding company. Valor and its subsidiaries were central to the Tribal Bond Scheme and were used by Galanis to carry out the fraud. The Aurelius Blog alleges that a specific Valor subsidiary also played a role in the Tribal Bond Scheme, and was part of COR.

51.     Documents obtained by the SEC in its investigation of the Tribal Bond Scheme show that Galanis used his alleged connection with COR to demonstrate his financial backing to perpetrate the fraud. During the Tribal Bond Scheme, Galanis also represented to his co-conspirators that he controlled companies associated with COR, including COR itself.

52.     The Aurelius Blog and accompanying documents also suggested that Sugarman held a majority interest in an entity named JAS Partners 1, LLC ("JAS Partners"). JAS Partners, along with Banc executive Seabold, controlled Camden Capital Partners, LLC ("Camden"). According to the Aurelius Blog, Camden was used to finance Galanis during the Tribal Bond Scheme and was also utilized by Galanis during the Gerova securities fraud.

53.     In addition, the Aurelius Blog alleges ties between Galanis and Brownstein. In 2011, a private investment firm run by Brownstein was a major investor in Prospect Global Resources, Inc. ("Prospect Global"), an entity which the SEC identified as a company Galanis controlled, and to which he funneled money obtained through his frauds.

54.     Banc's Board had become aware in 2015 of certain alleged Galanis relationships with officers and directors at Banc. Defendants Sznewajs, Benett, Karish and Schnel were then current directors. However, these matters were not disclosed to shareholders at the time. Banc shares fell $4.61 per share, or 29 percent, the day the Aurelius Blog appeared on *SeekingAlpha*.com.

**C.    Banc Makes Multiple False Statements About the Aurelius Blog.**

55.    In response to the Aurelius Blog, Banc quickly issued a press release emphasizing that the Board had been aware of the allegations for *more than a year*, but that an investigation did not find them credible.

56.    The press release, issued on October 18, 2017 – just hours after the *Seeking Alpha* blog was published – included the following statements:

> Banc of California, Inc. today announced it is aware of allegations posted in a financial blog. The Company's Board of Directors has been aware of matters relating to Jason Galanis including certain claims he had made suggesting an affiliation with members of the Company, its Board, and/or its Executive team. *The Board, acting through its Disinterested Directors, immediately initiated a thorough independent investigation* led by Winston & Strawn, and has received regular reports including related to regulatory and governmental communications over the past year. [emphasis supplied].

> The complaint filed by the Department of Justice against Mr. Galanis and others dated May 9, 2016. . . clearly states that Mr. Galanis' claims to be affiliated with COR Capital were fraudulent. . . Banc of California and its Disinterested Directors will make further facts publicly available as appropriate.

57.    On October 19, 2016, the Company filed a Form 8-K with the SEC, which attached a copy of the October 18, 2016 press release.

58.    Also on October 19, 2017, the Company held an analyst conference call to discuss its third quarter 2016 financial results. Defendant Grosvenor reaffirmed the statements contained in the Company's press release issued the day before that the Board's "independent" investigation found no evidence that Galanis exercised control over Banc or any of its directors.

59.     Specifically, Grosvenor provided the following description of the Board's role in the prior investigation:

> As discussed in our press release yesterday, management first advised the Board of Directors in 2015 regarding the facts then known pertaining to the circumstances associated with Jason Galanis's indictment, including certain claims attributed to Galanis that he was affiliated in some manner with the Company or members of the Company's Board of Directors or management.
>
> In response, *the Board of Directors determined to retain outside counsel to independently investigate the matters raised and report any information* that might indicate the possible existence of any potential impropriety. The results of that investigation, which has continued over the course of more than a year, failed to disclose any ownership interest by Galanis in the Company or the bank, and affirmatively confirmed that he exercised no direct or indirect control over the Company or the bank or any entity owned or affiliated with Steven Sugarman or any other member of the Board of Directors. [emphasis supplied].
>
> The investigation also failed to disclose any past or present lending relationship between Galanis and the bank. In fact, the inquiry disclosed instances in which attempts by Galanis to establish a business relationship with the Company, presumably in furtherance of the fraudulent schemes for which he subsequently pled guilty, were unsuccessful.
>
> In that regard, the Company shared information developed in the course of its own investigation in cooperation with the government's prosecution of Galanis and others. That cooperation is evidenced by, among other matters, Paragraphs 40 and 41 contained in the affidavit submitted by the FBI's special agent in charge of the government's investigation as recited in the letter of Company counsel. As has been made clear, at

least by reputable news organizations, none of the Company or the bank or any member of the Board of Directors or management has been the subject of the government's prosecution of Galanis.

Finally, in response to the allegations contained in the Seeking Alpha post and *at the direction of the disinterested members of the Board*, Company counsel has made written demand, a copy of which is included in our filing this morning, for the immediate removal and a written retraction of the article. In addition, the Company has been advised by its counsel that the demonstrably egregious nature of the defamatory statements constitutes actionable libel per se, and the Company intends to vigorously pursue all of its legal remedies. [emphasis supplied].

As a result, on the advice of counsel and in order to preserve our rights, we are not going to discuss any further specifics about Galanis during today's call while our formal demands for removal and a retraction of the article are pending. We will provide periodic public updates and further information as additional developments occur.

60.    At the time each of these statements describing the Board's purported process and decision-making on the Galanis issues, defendants Sznewajs, Benett, Schnel and Karish were members of the Board. Given the prominence with which the Company disclosed the alleged findings of the Board, including in a press release, an investor conference call, and a Form 8-K, and that the disclosures describe the Board's knowledge and actions, these directors knew that the October 18, 2016 press release falsely conveyed the extent and nature of the Board's prior investigation into possible relationships between Galanis and corporate insiders. Grosvenor, as General Counsel for Banc, likewise knew or recklessly disregarded that the statements about the Board's actions and the "independence" of Winston & Strawn were false, as Winston & Strawn had previously represented Banc.

61.     On October 27, 2016, Banc's independent auditor, KPMG, which had not previously been advised of the Winston & Strawn investigation related to Galanis, sent Defendant Sznewajs a letter "raising concerns about allegations of 'inappropriate relationships with third parties' and 'potentially undisclosed related party relationships.'" That same day, the Company formed a Special Committee of directors to investigate the allegations raised in the *SeekingAlpha* report.

62.     The Special Committee initially consisted of Defendants Schnel, Karish, Benett, and Sznewajs, along with non-party Holoman, who left the Special Committee before it concluded its work. Banc represented to investors that each of these directors were "independent" for the purpose of the investigation. However, each director was conflicted from the outset, because, among other things, the Aurelius Blog contained allegations against them as well.

63.     For example, the Aurelius Blog alleges that (a) Defendant Schnel was a partner of Brownstein, and the two had cofounded a company; (b) Defendant Karish was a director at Digital Turbine with an in-law of Sugarman; (c) Defendant Benett was an investment banker with Keefe, Bruyette & Woods ("KBW") which had been "paid millions by BANC as underwriter of securities offerings;" and (d) Defendant Sznewajs was previously the CEO of West Coast Bank, which received a Cease and Desist Order from regulators in 2009 due to "management whose policies and practices are detrimental to the bank."

64.     On November 10, 2015, Banc filed a Form 12b-25 that revealed the formation of the "Special Committee of Independent Directors" on October 27, 2016 to review "certain purported improper relationships and related party transactions and related matters." The press release provided no information about the composition of the committee or relations that were being reviewed.

65.     Also on November 10, 2016, Banc filed a notice with the SEC stating that it was unable to file its quarterly report because of the Special Committee's ongoing investigation:

1

2

3

4

5

6

7

8

9

> [The Company] is delaying the filing of its Quarterly Report on Form 10-K for the fiscal quarter ended September 30, 2016 . . . at this time to allow for completion of a review into certain purported improper relationships and related party transactions and related matters. The review includes an investigation by independent legal counsel having no prior relationship with the Company or its officers and directors under the direction of a Special Committee of Independent Directors, which was established by the Board of Directors on October 27, 2016.

10   66.   On December 27, 2016, Banc announced that Defendant Benett

11   would not stand for re-election as a director of the Company at the 2017

12   shareholder meeting. Benett indicated that his decision not to stand for re-election

13   was for personal reasons, based upon his assessment of the demands of his business

14   activities and employment.

15   67.   On January 23, 2017, Banc issued a press release disclosing that the

16   Company's October 18, 2016 press release contained false statements regarding

17   the Board's conduct. In relevant part, the January 23, 2017 press release stated:

18

19

20

21

22

23

24

25

26

> On October 18, 2016, an anonymous blog post raised questions about related party transactions and other issues with respect to the Company. As previously disclosed, in response to these allegations, the Board formed a Special Committee which commenced a process to review the allegations. Shortly thereafter, on October 27, 2016, the Company's independent auditor, KPMG, sent a letter to Mr. Sznewajs in his capacity as Chair of the Company's Joint Audit Committee (the "KPMG Letter") raising concerns about allegations of "inappropriate relationships with third parties" and "potential undisclosed related party relationships."

27

28

> On October 30, 2016, the Special Committee retained WilmerHale, a law firm with no prior relationship with

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

the Company, to conduct an independent investigation to address certain issues raised by the blog post, as well as questions raised by the KPMG Letter. In accordance with the KPMG Letter, WilmerHale will make a final report to the Special Committee and KPMG on the results of its investigation. The Special Committee expects that this final report will take place within weeks.

While certain work remains to be completed, to date WilmerHale's inquiry has not found any violation of law. In addition, contrary to the claims in the blog post, the inquiry has not found evidence that Jason Galanis has any direct or indirect control or undue influence over the Company. Furthermore, the inquiry has not found evidence establishing that any loan, related party transaction, or any other circumstance has impaired the independence of any director.

Through the inquiry, however, the Special Committee has determined that a press release issued on October 18, 2016 contained inaccurate statements. *In that press release, the Company stated that the "Board of Directors, acting through its Disinterested Directors" had, as of October 18, 2016, investigated issues raised in the blog post. This press release was inaccurate in certain respects. The review established that although an investigation had been conducted, it was not initiated by the Board of Directors; rather, it appears to have been directed by Company management rather than any subset of independent directors. In addition, the press release characterized the investigation as "independent" without disclosing that the law firm conducting the investigation had previously represented both the Company and the Company's CEO individually. Furthermore, the press release stated that the Board or a group of "Disinterested Directors" had received "regular reports including related to regulatory and governmental communications." This overstated both the degree to which the Company had been in contact with regulatory agencies about the subject matter referenced in the blog*

> *post, as well as the involvement of the directors in oversight or direction of the inquiry.* [emphasis supplied].
>
> Related to this matter, on January 12, 2017, the Securities and Exchange Commission ("SEC") issued a formal order of investigation directed at certain of the issues that the Special Committee is reviewing. Also on January 12, 2017, the SEC issued a subpoena seeking certain documents from the Company, primarily relating to the October 18, 2016 press release and associated public statements. The Company intends to fully cooperate with the SEC; in addition, the Special Committee will share the results of its review with the SEC staff.

68.     In a separate press release issued the same day, Banc announced Sugarman's resignation from all positions with the Company. He was replaced as Chairman by Defendant Sznewajs, and the Company announced a convoluted interim executive structure, as follows:

> The Office of the CEO/President will be composed of Hugh Boyle, Chief Risk Officer, who will additionally assume the title of Interim Chief Executive Officer, and J. Francisco A. Turner, Chief Strategy Officer and Principal Financial Officer. Mr. Turner will partner with Mr. Boyle and assume the title of Interim Chief Financial Officer and President.

69.     On this news, Banc's shares fell $1.50, or nearly 10 percent.

70.     On February 9, 2017, the Company issued a press release announcing that "WilmerHale has made a final report to the Special Committee . . . and has confirmed its earlier conclusion that the inquiry has not found any violation of law." The investigation concluded that Galanis had no indirect or direct control or undue influence over the Company and that no loans or related party transactions had impaired the independence of any director.

71.     The directors on the Special Committee (including Schnel, Sznewajs, Benett, and Karish) were directly responsible for, and undoubtedly aware of, the

phony October 18, 2016 press release when it was issued. Yet none of the Special Committee members were held accountable, nor was Grosvenor, who repeated the falsehoods on the October 19, 2016 investor conference call and signed the Form 8-K by which the October 18, 2016 press release was filed with the SEC.

72.     These breaches of disclosure by the Special Committee members and Defendant Grosvenor led directly to a subpoena and formal order of investigation by the SEC.

**D.     Banc's Board and Top Executives Are Reshuffled.**

73.     With Sugarman's exit announced on January 23, 2017, and their hand-picked slate of new officers in charge of Banc's operations, Defendants Schnel, Sznewajs, Benett, and Karish were now effectively in control of the Company. Banc promptly announced that Defendant Benett, who previously decided not to stand for reelection, had suddenly "reconsidered this decision, and wishes to stand for re-election." The remaining two legacy directors, Holoman and Brownstein, left the Company in the Aurelius Blog aftermath.

74.     On February 7, 2017, the Board announced the appointment of Defendant Lashley as a director, effective February 16, 2017. On April 27, 2017, the Board announced the appointment of Defendant Bowers as President, CEO and a director, effective May 8, 2017.

75.     In addition to these Board changes, key senior personnel soon left or would be terminated. On or around January 25, 2017, Banc terminated Salas, who had served as a consultant to Banc since mid-2016 and had been hired as Executive Vice President and Chief of Staff. On or around March 13, 2017, Seabold, a Banc founder and Executive Vice Chairman, was involuntarily placed on indefinite administrative leave. And on May 29, 2017, Endresen, Managing Director, SBA (Small Business Administration) Lending, was terminated.

76.     In detailed wrongful termination lawsuits filed against Banc, these former insiders have alleged serious internal control failures at Banc by the Special Committee members, and Defendants Lashley and Bowers.

77.     First, they allege that the Special Committee investigation into the Galanis allegations focused exclusively on allegations against certain Banc insiders relating to Galanis, while intentionally turning a blind eye to credible allegations that other members of the Board also suffered from long undisclosed, debilitating conflicts of interest. Second, they allege that, to bolster financial performance at Banc in the wake of the Aurelius Blog scandal, the Defendants engaged in improper accounting to prop up Banc's financial results for the first quarter of 2017 and maintain Banc's appearance of success.

### i.  The Special Committee Investigation Was Flawed.

78.     On September 5, 2017, Seabold, Banc's former Executive Vice Chairman, sued Banc in Los Angeles Superior Court, Case No. BC 674694, for wrongful discharge in violation of public policy and breach of contract, among other things. Seabold accused Banc of wrongful termination and alleges a scheme executed by the Special Committee members to avoid the consequences of their own misconduct and conflicts of interest, entrench themselves and their cronies on Banc's Board, and eliminate anyone standing in their way.

79.     According to Seabold, Benett, Karish, Sznewajs, and Schnel, each with Banc since at least 2013, took advantage of the Galanis allegations to force out Banc's founders, whistleblowers, and any others who attempted to ensure Banc complied with its disclosure and reporting obligations. According to Seabold, Defendants Benett, Karish, Sznewajs, and Schnel each suffered from actual, undisclosed conflicts of interest, but were able to misuse the Special Committee to divert attention away from their own misconduct to secure control of Banc.

80.     As Sugarman, Brownstein, and Seabold became the targets of the Special Committee's investigation regarding Galanis, Sugarman expressed his concerns to Defendant Schnel that Defendant Benett had himself violated Banc's corporate opportunities and conflict of interest policies, and suffered from his own undisclosed conflicts of interest. According to Seabold, Defendant Benett's conflicts extended back to 2014, when he was employed by KBW, an investment banking firm, which did work with Banc and its competitors.

81.     According to Seabold, the Nominating and Governance Committee, of which Defendant Schnel was a member, failed to take any action against Benett because Defendant Karish was involved in similar related party transactions. According to Seabold, Defendant Benett had agreed not to stand for reelection to Banc's Board in an attempt to allay Sugarman's concerns about Benett's conflicts of interest, but that in reality had never intended to do so.

82.     Defendant Karish also suffered from undisclosed conflicts of interest. According to Seabold, Defendant Karish was employed by Heritage Group, a large investor in a separate business owned by Brownstein. Seabold alleges that not only was Heritage Group the largest investor in Brownstein's business, but Defendant Karish had the primary role of overseeing this investment. Despite this plain conflict, Karish allegedly failed to disclose such material information to the Banc and investors.

83.     Seabold also alleges that Karish served on the board of another public company previously accused on *SeekingAlpha* of fraudulent business practices, something Karish never revealed to the Board. Seabold alleges that following the Galanis post, tipsters contacted Banc to alert the Board that Karish had been accused of breaching his fiduciary duties in a prior case and had used the "investigation" of those allegations to entrench himself. Seabold further alleges that Banc employees responsible for compliance insisted that Karish be reviewed

1    for conflicts of interest, but that Karish had refused. Seabold claims that those Banc

2    employees who insisted on the review no longer work for Banc.

3    84.    Seabold claims that Defendant Sznewajs was likewise involved in

4    undisclosed self-dealing. According to Seabold, Defendant Sznewajs never

5    disclosed that he, as Chairman of the Audit Committee, had approved hiring his

6    son's firm to underwrite an offering by Banc.

7    85.    Seabold's complaint provides detailed allegations about how the

8    members of the Special Committee advanced their own personal interests by

9    targeting longtime Banc employees and Board members for removal. According

10   to Seabold, despite never uncovering evidence of any improper relationships

11   between Banc and Galanis, Defendants Benett, Karish, Sznewajs, and Schnel

12   successfully manipulated the Special Committee to achieve their goal of removing

13   Sugarman and others from the Company, and assuming control.

14   86.    Seabold's allegations are corroborated by the Special Committee's

15   failure to address its own misconduct in connection with Banc's issuance of the

16   admittedly false October 18, 2016 press release, which the Special Committee

17   directors knew or recklessly disregarded was false, and which they nevertheless

18   authorized to be published, or failed to immediately retract. They are also

19   consistent with the Special Committee's failure to specifically address the

20   allegations of their own conflicts described in the Aurelius Blog.

21   87.    Similarly, on August 11, 2017, Salas, Banc's former Executive Vice

22   President and Chief of Staff, sued Banc in Los Angeles Superior Court, Case No.

23   BC 672208, for breach of contract, wrongful termination, fraud and other statutory

24   violations arising from the termination of his employment.

25   88.    Salas alleges that, through his role as Executive Vice President and

26   Chief of Staff, he became aware through multiple sources of allegations and

27   evidence of wrongdoing by members of the Special Committee.

28

---

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

89.     Salas alleges breaches of fiduciary duty and self-dealing by certain members of the Special Committee.

90.     Salas alleges false statements made by Special Committee member Defendant Benett in connection with conflicts of interest and adherence to board policies. Salas alleges that he was informed that this misconduct was brought to the Board's Governance Committee, yet the Committee Chairman, Defendant Schnel, refused to investigate or discipline any director, allegedly because such an investigation would result in criticism of other directors.

91.     In a recent discovery filing in the Securities Class Action, Sugarman submitted evidence that the members of the Special Committee sought to block an investigation into their own conflicts of interest.

92.     In a sworn statement, Sugarman stated that in early December 2016, Banc initiated a risk management and compliance review "to ensure there were not unknown risks present related Banc's compliance with its Governance Guidelines, Code of Conduct, and other key governance policies." According to Sugarman, "during this process I became aware of several potential disclosure, control, and compliance and SOX items associated with directors Jeffrey Karish, Halle Benett, Jonah Schnel and Robert Sznewajs (the 'Entrenched Directors'), and others." These directors comprised the membership of the Special Committee.

93.     In a filed memorandum, Sugarman identified the items as follows, in a manner consistent with the allegations made by Seabold and Salas:

> Jeffrey Karish. Mr. Karish: (a) defrauded his employer Terry Semel and covered up the fraud through a confidential settlement agreement that was not disclosed to Banc in violation of Banc policy; (b) invested in a company the blog alleges to be controlled by Galanis; (c) without adequate disclosure to Banc, accepted a job with Dr. Richard Merkin, the largest investor (over 25%) in director Chad Brownstein's companies, calling each of

their independence into question; (d) accepted and quickly departed another job without disclosure to Banc in violation of Banc policy; and (e) had been associated with three companies or their CEOs who were attacked by short seller bloggers on the same website, including two attacked by Aurelius, suggesting he may have leaked information about Banc to Aurelius . . . .

Halle Benett. Mr. Benett: (a) changed jobs without disclosure in violation of Banc policy, including to a competing RIA business and attempted to use Banc resources to launch a competitive product; (b) breached his promise to recuse himself from related party transactions involving his employer KBW; (c) twice misrepresented facts relating to his employment and affiliations with KBW; (d) failed to disclose KBW's representation of Impac Mortgage (a competitor) in the acquisition of CashCall; (e) failed to disclose his and KBW's role in representing Opes Advisors in its introduction and sale to Flagstar Bank, to whom Banc had been attempting to sell similar assets (usurping a Banc opportunity); and (f) intervened with Banc employees to cause Banc to pay increased fees to KBW.

Jonah Schnel. Mr. Schnel: (a) invested in a company alleged by blog to be controlled by Galanis; (b) while overseeing the investigation of Mr. Brownstein, was an investor in a company operated by him and served as a trustee for trusts associated with his family, calling each of their independence into question; and (c) at another company where he was a director, had been accused of fraud and hired Michael Santulli, a current Banc consultant involved in this case, to manufacture a straw plaintiff for a lawsuit against management that would protect Mr. Schnel from scrutiny.

Robert Sznewajs. Mr. Sznewajs: (a) had a child who worked for and received compensation from an investment bank retained by Banc (and worked on Banc matters); and (b) ignored concerns and requests relating to control violations raised by the head of Banc's SOX compliance.

94.     According to Sugarman's sworn statement, "[a]fter consultation with counsel, I believed as Chairman and CEO I had an obligation to review and investigate the matters further to determine the appropriate resolution before certifying Banc's financial statements." Sugarman states that on or about December 12, 2016, "I made a presentation to the Board regarding Mr. Benett's conflicts of interest."

95.     However, according to Sugarman, at a December 23, 2016 Board meeting called by Defendants Karish and Schnel, Sugarman states that "I recall them stating that they would not allow management to review director disclosures, conflicts or business activities or be part of the process of any reviews of controls as it applies to members of the Board."

96.     Sugarman states that "I expressed my concerns about control and compliance risks" to directors not on the Special Committee, and "discussed whether I should stay at Banc in light of the refusal by certain directors to allow me to do work that I felt was necessary before I could sign Banc's financial statements and what I believed was retaliation" for reporting on Defendant Benett.

97.     Sugarman states that Banc threatened to terminate him but that he "agreed to a separation agreement with Banc for several reasons, including principally that I did not feel comfortable continuing to work for Banc in light of the then current members of the Board of Directors." Sugarman states that he "felt I could not certify Banc's financial statements due to misconduct by the Entrenched Directors, who had forbidden me from following up on whistleblower reports of misconduct and Sarbanes-Oxley violations, and had retaliated against me and others for seeking to disclose and address these concerns."

98.     On January 23, 2017, Sugarman left Banc. Yet the directors on the Special Committee remained, notwithstanding Banc's admission that the October 18 and 19, 2016 statements made by the Board (including each of the Special

Committee members), or on its behalf, were false, and had directly caused a subpoena and investigation by the SEC. Furthermore, no disclosure by Banc to shareholders has addressed the allegations in the Aurelius Blog about the Special Committee's *own* conflicts of interest, or those identified by the former insiders.

99.    In this manner, the Special Committee members were able to hide their conflicts of interest, including their *own* failure to timely disclose the existence of the Galanis allegations to shareholders (and Banc's own auditor KPMG) back in 2015, when they admittedly first became aware of them.

100.   Banc failed to disclose in the Form 8-K announcing Sugarman's separation from Banc that he did so due to a disagreement with Banc, notwithstanding Banc's disclosure obligations under SEC Disclosure Item 5.02 to identify any such disagreement, further hiding information from shareholders.

### ii.  Banc Manipulated First Quarter 2017 Results.

101.   Former executives also allege that as the Aurelius Blog scandal engulfed Banc, Banc's management, with approval of the Audit Committee, sought ways to artificially inflate Banc's first quarter 2017 financial results to maintain Banc's credibility in the market. According to Seabold, shortly after the "power grab" was executed by Benett, Sznewajs, Karish and Schnel, it became apparent as early as January 2017 that Banc would fall short of consensus operating results for the first quarter 2017.

102.   Seabold alleges firsthand communication with Banc's Interim CEO during this time period, who stated that the Company was going to miss consensus earnings estimates and needed to generate revenue to cover the shortfall. Seabold alleges that shortfall was either known to the Audit Committee or recklessly disregarded by it. Yet the Company continued to provide the market with public guidance that Banc would achieve $2.00 earnings per share (EPS) for the year.

103.    Seabold alleges that Banc's leadership refused to cut guidance and risk exposing their unlawful acts and self-dealing. Instead, they chose to manufacture earnings by causing Banc to improperly reverse bonus accruals to appear more profitable.

104.    Seabold alleges that to implement this plan, Banc initiated a so-called "reassessment" for accruals for 2016 bonuses. This resulted in reversing $7.8 million in such accruals, which were then credited toward liabilities accrued in the first quarter 2017, resulting in increased earnings for the first quarter of 2017.

105.    Seabold alleges that the accruals should never have been reversed and that Banc's "explicit approval of such cookie jar accounting" was improper.

106.    Likewise, on December 7, 2017, Endresen, Banc's former Managing Director SBA Lending, sued Banc in Los Angeles Superior Court, Case No. BC 685641, for wrongful termination, breach of contract and violations of various labor statutes. Endresen alleges, among other things, that she was fired for reporting improper accounting practices that violated GAAP and Sarbanes Oxley in connection with Banc's financial disclosures.

107.    Specifically, Endresen claims that as early as January 2017, she was informed that Banc had decided to scale back the Company bonus pool, and consequently, certain employee bonuses would be reduced. Endresen alleges that, in early April 2017, she met with Michael Gellormino, Chief Internal Audit Officer, and Defendant Lashley, Audit Committee Chairman, to complain about illegal conduct in the workplace, specifically Sarbanes Oxley violations. Endresen alleges that she requested - and Banc agreed - to record this conversation.

108.    Endresen allegedly gave a detailed explanation of the accounting irregularities engaged in by Banc, misrepresentations on public filings, bonus accrual reversal, and internal statements being in conflict with external statements relating to Banc's 2016 performance. Endresen alleges that Defendant Lashley

1   advised her during the investigation that he himself was central in making the
2   decision to reassess the bonus accruals.

3       109.   Endresen alleges that, in the first quarter of 2017, following the
4   separation of Sugarman and other executives, Endresen was added to the
5   Disclosure Committee as a nonvoting participant, without any explanation.
6   Endresen alleges that this was done to spread liability for false public disclosures
7   to the management team. During one of these disclosure meetings, Endresen went
8   on record as to her disagreement on the justification and validity of the bonus
9   accrual, which shifted over $7 million in earnings from 2016 to 2017.

10      110.   The improper bonus accounting identified by Salas and Endresen is
11  evident in Banc's filed financial statements for the relevant periods. For the three
12  years ended December 31, 2016, Banc's net income had grown by an average of
13  approximately 38% per year. Banc's quarterly net income for the year ended
14  December 31, 2016 averaged approximately $29 million. By comparison, Banc
15  reported net income of just $17.2 million for the quarter ended March 31, 2017,
16  approximately 50% below earnings reported for the fourth quarter of 2016.

17      111.   Based on disclosures in Banc's March 31, 2017 financial statements,
18  filed with the SEC on May 10, 2017, Banc reversed approximately $7.8 million of
19  accrued incentive compensation that had been recorded as a liability at December
20  31, 2016, and had been recognized as an expense in Banc's financial statements
21  for the year ended December 31, 2016, recording the reversal as a reduction in first
22  quarter 2017 compensation expense.

23      112.   Banc's first quarter 2017 Form 10-Q described the reversal as
24  follows: "At December 31, 2016 the Company accrued a liability for estimated
25  discretionary incentive compensation payments to certain employees. The amount
26  paid was less than the accrued liability. Consequently, the Company reversed the
27  excess accrual and recorded a credit to salaries and employee benefits on the
28  consolidated statements of operations of $7.8 million during the three months

ended March 31, 2017. The reversal, based on new information driven by changes to certain facts and circumstances, was determined to be a change in estimate."

113.   The effect of the reversal was to increase Banc's pre-tax earnings for the quarter ended March 31, 2017 by approximately $7.8 million, representing 48% of Banc's reported pre-tax earnings for the first quarter. The reversal represented approximately 5.2% of Banc's reported pre-tax income for the year ended December 31, 2016. The reversal had a material effect on Banc's December 31, 2016 and March 31, 2017 financial statements, though the relative effect was far greater on the first quarter 2017 financial statements.[1]

114.   Banc reported earnings per share on a fully diluted basis of $0.23 for the first quarter of 2017. Remarkably, approximately $0.11 of this amount was the direct result of the disputed reversal of the 2016 accrued incentive compensation. In other words, without the disputed reversal of the 2016 accrued incentive compensation, Banc would have reported just $0.12 in earnings per share for the quarter ended March 31, 2017, compared with earnings per share of $0.56 reported for the prior quarter ended December 31, 2016.

115.   The price of Banc's shares had declined significantly beginning in the fourth quarter of 2016 and continuing into 2017. From August 2016 through October 2016 the share price fell from $22 per share to $13 per share. Significant drops in earnings and share prices provide a strong incentive for management to take drastic actions to improve earnings and share prices, including intentional misapplications of GAAP.

116.   In evaluating the reasonableness of estimates for discretionary incentive compensation payments, entities are required to consider the effects of all events occurring subsequent to the balance sheet date: "An entity shall

---

[1]   Materiality is generally defined based on whether an amount is expected to influence the decisions of users of the financial statements. As a rule of thumb, the quantitative benchmark for publicly held entities generally ranges from 5% to 10% of reported net income.

recognize in the financial statements the effects of all subsequent events that provide additional information about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing financial statements.[2] For SEC filers, subsequent events must be evaluated through the date that the financial statements are issued.[3]

117.   Because it is a public company, for purposes of evaluating the reasonableness of the estimated accrued incentive compensation recorded in Banc's records as of December 31, 2016, management was required to evaluate and consider all information that was available through March 1, 2017, the date that Banc's 2016 financial statements were filed with the SEC.

118.   If, based on the information available to Banc management on March 1, 2017, management believed it was likely that some or all of the incentive compensation bonuses accrued at December 31, 2016 would not be paid, such amounts should have been reversed as of December 31, 2016, prior to issuance of Banc's 2016 financial statements, rather than being reversed in the financial statements for the quarter ended March 31, 2017.

119.   During the two month period following December 31, 2016, Banc's Board would have been fully aware of the expected significant decline in first quarter earnings and earnings per share relative to the reported earnings for the quarter ended December 31, 2016, and the continuing decline in the price of Banc's shares. During this same period, Banc was also struggling with the allegations of wrongdoing related to the Aurelius Blog post in October 2016, and the announcement of the SEC investigation in January 2017.

120.   These conditions created a strong incentive to take actions to bolster first quarter 2017 earnings by whatever means necessary. On or prior to March 1, 2017, two full months after year-end, the Board knew of the likely reduction of

---

[2] FASB Accounting Standards Codification, Topic 855-10-25-1.
[3] FASB Accounting Standards Codification, Topic 855-10-25-1A.

any accrued but unpaid 2016 incentive compensation. Banc's actions in reversing the accrued 2016 incentive compensation and recognizing the reversal as an increase in <u>first quarter of 2017</u> earnings (rather than an increase in <u>year-end 2016</u> earnings) represented an intentional misstatement of Banc's financial statements for the year ended December 31, 2016 and quarter ended March 31, 2017.

121.   This is precisely the sequence of events alleged by former insiders Salas and Endresen with knowledge of key facts. Salas alleges that, following his termination by Banc in <u>January 2017</u>, he was informed that Banc planned to renege on its commitments to pay Salas and others their 2016 bonuses, including both severed and non-severed employees, despite a highly profitable and successful 2016 for Banc, as a means of inflating reported earnings for the first quarter of 2017. According to Salas, Banc did so with the purpose and effect of "materially and falsely improving its reported profitability in the first quarter of 2017."

122.   This is also consistent with Endresen's allegations that, as early as <u>January 2017</u>, she was informed of Banc's decision to scale back the bonus pool and that certain employees' bonuses for 2016 would be reduced, including her own. Even Banc's 2017 Proxy Statement, filed on April 27, 2017, admits that certain bonus reductions were made for 2016 "in light of the extraordinary challenges faced by the Company <u>in late 2016 and early 2017</u>" – events which occurred well before March 1, 2017 when the Form 10-K for 2016 was filed, in which the effect of these reversals should have been disclosed.

123.   Banc's reduction of incentive based compensation for 2016 is further highly dubious in light of the Company's reported performance in 2016, which it described in a January 30, 2017 press release as a "record" year in which Banc "exceeded each of our stated financial targets."

124.   Based on the information available to management and the Board, Banc's fiscal year 2016 financial statements included in its Form 10-K should have been adjusted to reduce the accrued incentive compensation as of December 31,

1    2016 resulting in an increase in earnings for the fourth quarter of 2016, rather than

2    shifting the income to the first quarter of 2017.

3        125.   The 2016 Form 10-K was filed on March 1, 2017, and was signed by

4    Defendants Lashley, Benett, Karish, Schnel and Sznewajs. Banc's first quarter

5    2017 Form 10-Q disclosing these false and misleading financial statements was

6    filed on May 10, 2017, and was signed by defendant Bowers.

7        126.   At the time of the Form 10-K filing, the Audit Committee consisted

8    of Defendants Lashley, Benett, Karish and Sznewajs. At the time of the Form 10-

9    Q filing, defendant Bowers was serving as CEO and a director. Given the

10   materiality and impact of the wrongful accrual accounting on reported results for

11   fiscal year 2016 and the first quarter of fiscal year 2017, each of these Defendants

12   and Schnel knew or recklessly disregarded the false and misleading nature thereof.

13       127.   In addition, in the Form 10-K for 2016, filed on March 1, 2017,

14   Banc's auditor stated that the Company suffered from material weaknesses in its

15   internal controls and suffered from a "number of control deficiencies across

16   multiple processes." These matters are the direct responsibility of the Board.

17   According to the auditor, Banc "has not maintained effective internal control over

18   financial reporting as of December 31, 2016, based on criteria established

19   in *Internal Control-Integrated Framework (2013)* issued by the Committee of

20   Sponsoring Organizations of the Treadway Commission (COSO)."

21                          **DAMAGES TO THE COMPANY**

22       128.   Banc has suffered, and continues to suffer, from the Individual

23   Defendants' wrongdoing described herein.

24       129.   As a result of misconduct by Defendants Benett, Karish, Schnel,

25   Sznewajs and Grosvenor, Banc disseminated the October 18, 2016 press release

26   and made statements falsely describing the Company's process regarding the

27   Galanis investigation. This false statement, which was made by the Board, or made

28

---

in its name, and which the directors failed to timely retract or correct, directly caused the SEC investigation, a highly damaging event for a public company.

130.   Furthermore, the Special Committee's subsequent investigation into the allegations of improper relationships and related party transactions was structurally flawed, as it was conducted by a set of conflicted Directors Benett, Karish, Schnel and Sznewajs, and failed to provide Banc and its shareholders with an independent review of all of the matters at issue.

131.   To the contrary, the Special Committee's investigation served to entrench these directors with their own undisclosed conflicts of interest. Banc continues to suffer from the Special Committee's ineffective efforts as the Company remains mired in an array of lawsuits and the SEC's ongoing investigation into the October 18, 2016 press release and the Board's response thereto.

132.   Banc and its reputation have been damaged by the improper manipulation of its financial results. As members of the Audit Committee, Defendants Benett, Karish, Sznewajs and Lashley approved an *ex post facto* basis for reassessing employee bonus estimates recorded as an expense for fiscal year 2016, which allowed them to materially overstate Banc's first quarter 2017 results. These Defendants, along with Schnel, signed a false and misleading Form 10-K which failed to disclose these issues. Likewise, Defendant Bowers signed a false and misleading Form 10-Q which failed to disclose these issues. This intentional misconduct has subjected the Company to additional risk and investor scrutiny.

133.   The Individual Defendants' improper statements, manipulation of financial results, failure to maintain adequate internal controls, and the Special Committee's flawed response to the allegations of impropriety, have severely impacted Banc's credibility. While other stocks in the financial sector increased dramatically over the last twelve to eighteen months, Banc's stock price continues to trade around $20 per share. In addition, in Forbes' rankings of America's "100

Largest Banks" in 2018, which measures banks based on 10 metrics related to growth, profitability, capital adequacy, and asset quality, Banc has dropped from 50 to 100 in just one year.

134.   Furthermore, as a direct and proximate result of the Individual Defendants' actions, Banc has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to: (a) costs incurred from repeatedly investigating the allegations of wrongdoing; (b) costs incurred from responding to the ongoing SEC investigation, and (c) costs incurred defending and settling other related claims, including the Securities Class Action, in which Judge Guilford, by order dated September 6, 2017, has sustained allegations that stock purchasers were defrauded in connection with Banc's failure to timely disclose the Galanis allegations, exposing Banc to massive liability.

135.   Plaintiff seeks to remedy the foregoing harm through the recovery of monetary damages and implementation of corporate governance reforms.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

136.   Banc is named as a nominal defendant solely in a derivative capacity.

137.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

138.   Plaintiff will adequately and fairly represent the interests of Banc in enforcing and prosecuting its rights and has hired experienced counsel. Plaintiff was a shareholder of Banc at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is currently a Banc shareholder.

139.   Plaintiff did not make a demand on the Board to institute this action because the Company faces the prospect of irreparable harm absent shareholder action.

140.   The Board is controlled by a majority of directors who are directly involved in conduct contrary to the best interests on the Company. Defendants

Sznewajs, Benett, Karish and Schnel knowingly issued the October 18, 2016 press release falsely describing the Board's process, or recklessly failed to immediately retract it, exposing the Company to the SEC investigation. These defendants are alleged by numerous former insiders to have subverted the Special Committee process to hide their own conflicts from shareholders, while consolidating their control of the Company, and their access to lucrative benefits associated therewith. These Defendants, along with Defendants Lashley and Bowers, caused the Company to issue financial statements based on the manipulation of bonus accounting. In addition, in the Form 10-K for 2016, filed on March 1, 2017, Banc's auditor states that the Company suffers from material weaknesses in its internal controls and suffers from a "number of control deficiencies across multiple processes." These matters are the direct responsibility of the Board. According to the auditor, Banc "has not maintained effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."

141. Under these circumstances, Plaintiff seeks damages but also injunctive relief as the Individual Defendants' actions and inactions represent an ongoing risk to Banc of irreparable harm. Plaintiff seeks injunctive relief including reforms to (a) strengthen the Company's controls over financial reporting; (b) strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (c) strengthen Banc oversight of its disclosure procedures; and (d) prevent or undo self-dealing and related party transactions and Board entrenchment.

142. Plaintiff did not make a demand on the Board to institute this action because such a demand would be futile.

143. A majority of the current Board is so personally and directly conflicted or so personally or directly committed to the decisions in dispute that

1  they cannot reasonably be expected to respond to a demand in good faith and

2  within the ambit of the business judgment rule.

3     144.   The specific factual allegations herein demonstrate a pattern of

4  decisions made repeatedly by a majority of directors over time, in defiance of

5  known facts and duties, sufficiently demonstrating that demand would be futile.

6     145.   Banc is controlled by its Board, which currently has nine (9) members

7  - Defendants Benett, Karish, Lashley, Schnel, Sznewajs and Bowers, along with

8  non-party directors Kirk Wycoff, Mary Curran, and Bonnie G. Hill. The non-party

9  directors each joined the Board after the Special Committee's investigation was

10  complete.

11     146.   Defendants Benett, Karish, Schnel and Sznewajs cannot respond to a

12  demand regarding the October 18, 2016 press release or the Board's response

13  thereto in good faith because the specific allegations show each is personally and

14  directly committed to defending the conduct at issue.

15     147.   In addition, Defendants Benett, Karish, Schnel and Sznewajs used the

16  Special Committee process to entrench themselves and secure the personal benefits

17  of their positions on the Board, while failing to advise shareholders of potentially

18  debilitating conflicts of interest identified in the Aurelius Blog, and by former Banc

19  officers and employees.

20     148.   Defendants Benett, Karish, Sznewajs, Bowers and Lashley cannot

21  respond to a demand regarding Banc's manipulation of earnings in the first quarter

22  2017 in good faith because the specific allegations show each is personally and

23  directly committed to defending the conduct at issue. These Defendants and Schnel

24  signed false and misleading SEC filings reflecting these manipulations.

25     149.   The Board's December 2016 rejection of Sugarman's request for an

26  investigation into and disclosure of conflicts of interest of Defendants Benett,

27  Schnel, Karish and Sznewajs is further evidence that any shareholder demand on

28  these same directors now would be futile.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

150.   In addition to being personally and directly conflicted or committed to the decisions in dispute in this action, each of Defendants Benett, Sznewajs, Karish, Schnel, Lashley and Bowers faces a substantial likelihood of liability for breaching their duties to the Company.

151.   In light of the myriad conflicts suffered by a majority of the Board, and the multitude of disputes embroiling the Company, including the formal SEC investigation, the Securities Class Action, and all related claims filed by former employees, Plaintiff should be appointed as an independent representative of Banc to pursue the derivative claims, as follows.

**Benett Is Personally and Directly Committed to All Decisions in Dispute Making Him Incapable of Adequately Responding to A Demand**

152.   Demand upon Benett to investigate or remedy any of the alleged wrongdoing would be futile. Benett knew about the wrongful acts at issue - including the October 18 and 19, 2016 false statements regarding the Board's conduct, the improper bonus accounting for 2016 and first quarter 2017, and the flawed Special Committee process - yet Defendant Benett participated in them anyway, demonstrating his personal and direct commitment to the wrongdoing.

153.   Benett was a member of the Board on October 18, 2016, the date that Banc issued a press release stating that the Board had initiated an "independent" investigation of the Galanis allegations, and had received "regular reports" on the investigation. These statements, made in the name of the Board, were false, yet Defendant Benett never corrected nor retracted them. In addition, Defendant Benett served as a director on October 19, 2016, the date that Defendant Grosvenor reaffirmed these statements in a conference call with analysts. Again, these statements were false, yet Defendant Benett never corrected nor retracted them. These breaches led directly to the SEC investigation.

154.   Benett has already been tasked with investigating these allegations as a member of the Special Committee, but breached his duty to investigate the claims fully and fairly on behalf of Banc, instead elevating his own interests and those of his fellow Special Committee members above the Company's best interest.

155.   Former employees described a series of improper undisclosed conflicts of interest and related party transactions involving Benett. On December 27, 2016, shortly after Sugarman alleges that he made a presentation about Benett's conflicts to the Board on December 12, 2016, it was announced that Benett would not be seeking reelection to the Board. However, after the January 23, 2017 announcement of Sugarman's departure, Benett suddenly reversed course, advising the Company on February 1, 2017 that he would stand for re-election after all – notably, only after Special Committee's flawed, limited investigation into potential conflicts of interest was being concluded.

156.   Defendant Benett, as a member of the Audit Committee, is also responsible for and participated in the accounting manipulations alleged herein. Given the materiality and impact of the improper accrual accounting on reported results for fiscal year 2016 and the first quarter of fiscal year 2017, Benett knew or recklessly disregarded the false and misleading nature thereof.

157.   Despite at least one whistleblower (Endresen) reporting the accrual manipulation to the Audit Committee Chairman, Defendant Benett approved the belated change to the estimated expenses that materially inflated Banc's financial results. In addition, Defendant Benett signed the Form 10-K for fiscal year 2016 that misstated Banc's financial results, and made false and misleading statements or omissions regarding the bonus accounting.

**Sznewajs Is Personally and Directly Committed to All Decisions in Dispute Making Him Incapable of Adequately Responding to A Demand**

158.   Demand upon Sznewajs to investigate or remedy any of the wrongdoing would be futile. Sznewajs knew about the wrongful acts at issue - including the October 18 and 19, 2016 false statements regarding the Board's conduct, the improper bonus accounting for 2016 and first quarter 2017, and the flawed Special Committee process - yet Defendant Sznewajs participated in them anyway, demonstrating his personal and direct commitment to the wrongdoing.

159.   Sznewajs was a member of the Board on October 18, 2016, the date that Banc issued a press release stating that the Board had initiated an "independent" investigation of the Galanis allegations, and had received "regular reports" on the investigation. These statements, made in the name of the Board, were false, yet Defendant Sznewajs never corrected nor retracted them. In addition, Defendant Sznewajs served as a director on October 19, 2016, the date that Defendant Grosvenor reaffirmed these statements in a conference call with analysts. Again, these statements were false, yet Defendant Sznewajs never corrected nor retracted them. These fiduciary breaches led directly to the SEC investigation.

160.   Defendant Sznewajs has already been tasked with investigating these allegations as a member of the Special Committee, but breached his fiduciary duty to investigate the claims fully and fairly on behalf of Banc, instead elevating his own interests and those of his fellow Special Committee members above the Company's best interest.

161.   Defendant Sznewajs, as a member of the Audit Committee, is responsible for and participated in the accounting manipulations alleged herein. Given the materiality and impact of the improper accrual accounting on reported results for fiscal year 2016 and the first quarter of fiscal year 2017, Sznewajs knew or recklessly disregarded the false and misleading nature thereof.

162.   Despite at least one whistleblower (Endresen) reporting the accrual manipulation to the Audit Committee Chairman, Defendant Sznewajs approved the belated change to the estimated expenses that materially inflated Banc's financial results for the first quarter of 2017. In addition, Defendant Sznewajs signed the Form 10-K for fiscal year 2016 that made false and misleading statements or omissions regarding the bonus expense accounting.

**Karish Is Personally and Directly Committed to All Decisions in Dispute Making Him Incapable of Adequately Responding to A Demand**

163.   Demand upon Karish to investigate or remedy any of the wrongdoing would be futile. Karish knew about the wrongful acts at issue - including the October 18 and 19, 2016 statements regarding the Board's conduct, the improper bonus accounting for 2016 and first quarter 2017, and the flawed Special Committee process - yet Defendant Karish participated in them anyway, demonstrating his personal and direct commitment to the wrongdoing.

164.   Karish was a member of the Board on October 18, 2016, the date that Banc issued a press release stating that the Board had initiated an "independent" investigation of the Galanis allegations, and had received "regular reports" on the investigation. These statements, made in the name of the Board, were false, yet Defendant Karish never corrected nor retracted them. In addition, Defendant Karish served as a director on October 19, 2016, the date that Defendant Grosvenor reaffirmed these statements in a conference call with analysts. Again, these statements were false, yet Defendant Karish never corrected nor retracted them. These fiduciary breaches led directly to the SEC investigation.

165.   Defendant Karish has already been tasked with investigating these allegations, but breached his duty to investigate the claims fully and fairly on behalf of Banc, instead elevating his own interests and those of his fellow Special Committee members above the Company's best interest.

166.   Defendant Karish met with members of management on or about December 23, 2016 and demanded they cease investigating any allegations of wrongdoing against the Board. This effort was designed to protect his own undisclosed conflicts from being exposed by the investigation.

167.   Specifically, Defendant Karish is alleged to have been employed by Heritage Group, a large investor in a separate business owned by Brownstein. Karish is also alleged to have served on the board of another public company previously accused on *SeekingAlpha* of fraudulent business practices, something Karish never revealed to the Board. Karish had been further alleged to have been accused of breaching his fiduciary duties in a prior case and had used the "investigation" of those allegations to entrench himself. Banc employees responsible for compliance that allegedly insisted that Karish be reviewed for conflicts of interest no longer work for Banc after Karish refused to cooperate.

168.   Defendant Karish, as a member of the Audit Committee, is also responsible for and participated in the accounting manipulations alleged herein. Given the materiality and impact of the improper accrual accounting on reported results for fiscal year 2016 and the first quarter of fiscal year 2017, Karish knew or recklessly disregarded the false and misleading nature thereof.

169.   Despite at least one whistleblower (Endresen) reporting the accrual manipulation to the Audit Committee Chairman, Defendant Karish approved the belated change to the estimated expenses that materially inflated Banc's financial results. In addition, Defendant Karish signed the Form 10-K for fiscal year 2016 that made false and misleading statements or omissions regarding the bonus accounting.

**Schnel Is Personally and Directly Committed to All Decisions in Dispute Making Him Incapable of Responding to A Demand**

170.   Demand upon Schnel to investigate or remedy any of the wrongdoing would be futile. Schnel knew about the wrongful acts at issue - including the October 18 and 19, 2016 statements regarding the Board and Galanis, the improper bonus accounting for 2016 and first quarter 2017, and the flawed Special Committee process - yet Defendant Schnel participated in them anyway, demonstrating his personal and direct commitment to the wrongdoing.

171.   Schnel was a member of the Board on October 18, 2016, the date that Banc issued a press release stating that the Board had initiated an "independent" investigation of the Galanis allegations, and had received "regular reports" on the investigation. These statements, made in the name of the Board, were false, yet Defendant Schnel never corrected nor retracted them. In addition, Defendant Schnel served as a director on October 19, 2016, the date that Defendant Grosvenor reaffirmed these statements in a conference call with analysts. Again, these statements were false, yet Defendant Schnel never corrected nor retracted them. These fiduciary breaches led directly to the SEC investigation.

172.   Schnel has already been tasked with investigating these allegations on the Special Committee, yet breached his fiduciary duty to investigate the claims fully and fairly on behalf of Banc, instead elevating his own interests and those of his fellow Special Committee members above the Company's best interest.

173.   Defendant Schnel is alleged by Sugarman to have met with members of management on or about December 23, 2016 and demanded they cease investigating any allegations of wrongdoing against the Board. Defendant Schnel is also alleged to have refused to investigate allegations that Defendant Benett suffered from debilitating conflicts of interest, noting that Defendant Karish was in the same position and Benett and the Special Committee would be forced to

investigate Benett as well. Schnel has thus demonstrated his inability to respond appropriately to any demand to investigate fellow members of the Special Committee.

174.   In addition, Defendant Schnel signed the Form 10-K for fiscal year 2016 that made false and misleading statements or omissions regarding the bonus accounting.

**Lashley Is Personally and Directly Committed to the Manipulation of 1Q 2017 Income Making Him Incapable of Adequately Responding to A Demand**

175.   Demand upon Lashley to investigate or remedy the alleged wrongdoing would be futile. Defendant Lashley knew about the wrongful acts at issue - including the improper bonus accounting for fiscal year 2016 and first quarter 2017 - yet Defendant Lashley participated in them anyway, demonstrating his personal and direct commitment to the wrongdoing.

176.   Defendant Lashley has been alleged by an insider (Endresen) to have, as Audit Committee Chairman, personally approved the decision to revise the estimated bonus expenses in the first quarter of 2017. There is allegedly a "recorded conversation" of Endresen describing accounting manipulations to Banc's Head of Internal Audit and Lashley, yet the whistleblower's allegations were dismissed.

177.   Defendant Lashley signed the Form 10-K for fiscal year 2016 that made false and misleading statements or omissions regarding the bonus accounting, and served as Audit Committee Chairman at the time the false and misleading first quarter 2017 Form 10-Q was filed.

178.   Defendant Lashley has demonstrated his unwillingness to investigate any demand into the alleged accounting manipulations.

**Bowers Is Personally and Directly Committed to the Manipulation of 1Q 2017 Income and Lacks Independence to Adequately Respond to A Demand**

179.   Demand upon Defendant Bowers to investigate or remedy the alleged wrongdoing would be futile. Defendant Bowers as CEO signed the first quarter 2017 Form 10-Q which materially and falsely overstated Banc's income. Given the materiality of the wrongful bonus accounting, Bowers knew or recklessly disregarded that the first quarter 2017 financial statements were improper.

180.   In addition, Defendant Bowers lacks independence. Banc's 2017 Proxy Statement admits that Bowers is not independent. As the current CEO of the Company, Bowers does not satisfy NYSE director independence standards because he derives his principal income from Banc, including material salary and cash and equity retention awards.

181.   On April 24, 2017, Bowers entered an Employment Agreement with Banc. Bowers' employment began on May 8, 2017.  Bower's employment agreement provides that he will be paid the following compensation:

- $700,000 per year from May 8, 2017 to April 30, 2018;
- $725,000 per year from May 1, 2018 to April 30, 2019;
- $750,000 per year from May 1, 2019 to April 30, 2020; and
- After April 30, 2020, at a rate to be determined by the Compensation Committee.

182.   Bowers is also eligible for a Target Bonus up to 100% of his base salary, with an Annual Bonus of between 0% and 150% of his base salary per year. The bonus amount will be determined by the Compensation Committee. Bower's employment contract also provides for participation in the Company's stock incentive program, among other employment consideration.

183.   Bower's employment contract provides that he "shall report directly to the Board" and can be terminated from his position with the Company for cause for failure to comply with directives from the Board.

184.   Currently, Defendant Karish chairs the Compensation Committee, and Defendant Sznewajs service as Vice Chair along with two non-party directors. Bowers is thus unable to investigate and pursue a demand against Defendants Karish or Sznewajs in a disinterested and independent manner because he is beholden to them for his compensation.

185.   Under these circumstances, Bowers lacks independence and would never act contrary to the interests of Defendants Karish, Sznewajs, or any director who controls his employment with Banc, excusing demand.

## CLAIMS FOR RELIEF

### COUNT I

**Against Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs for Breach of Fiduciary Duty**

186.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

187.   Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs, by reason of their positions as directors, and because of their ability to control the business and corporate affairs of banc, owed to Banc an obligation to act in good faith, in a manner reasonably believed to be in the best interest of Banc, and with the ordinary care and candor that a prudent person would use in similar circumstances.

188.   Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs acted in breach of their fiduciary duties.

189.   Defendants Benett, Karish, Schnel, Lashley, Bowers, and Sznewajs made or caused Banc to make false and misleading statements to shareholders regarding Banc's business and operations.

190.   Defendants Benett, Karish, Schnel, and Sznewajs in particular subverted the Special Committee process for their own benefit, and to entrench

themselves to protect their own tenures and all benefits associated therewith, including lucrative compensation.

191.   As a direct and proximate result of the breaches of fiduciary duty by Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs, Banc has sustained significant damages.

192.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

193.   The misconduct of Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs – through both their actions and conscious inaction – is not exculpated under Maryland or other applicable law.

## COUNT II
**Against Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs for Gross Negligence**

194.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

195.   Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs, by reason of their positions as directors, and because of their ability to control the business and corporate affairs, owed to Banc an obligation to act in good faith, in a manner reasonably believed to be in the best interest of Banc, and with the ordinary care and candor that a prudent person would use in similar circumstances.

196.   Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs acted in a manner representing an extreme departure from the ordinary standard of care.

197.   Defendants Benett, Karish, Schnel, Lashley Bowers, and Sznewajs made or caused Banc to make false and misleading statements to shareholders regarding Banc's business and operations.

198.   As a direct and proximate result of the gross negligence by Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs, Banc has sustained significant damages.

199.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

200.   The misconduct of Defendants Benett, Karish, Schnel, Lashley, Bowers and Sznewajs – through both their actions and conscious inaction – is not exculpated under Maryland or other applicable law.

## COUNT III

### Against Defendants Grosvenor and Bowers for Breach of Fiduciary Duty

201.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

202.   Defendants Grosvenor and Bowers, by reason of their positions as officers, and because of their ability to control the business and corporate affairs, owed to Banc an obligation to act in good faith, in a manner reasonably believed to be in the best interest of Banc, and with the ordinary care and candor that a prudent person would use in similar circumstances.

203.   Defendants Grosvenor and Bowers acted in breach of their fiduciary duties.

204.   Defendants Grosvenor and Bowers made or caused Banc to make false and misleading statements to shareholders regarding Banc's business and operations.

205.   As a direct and proximate result of the breaches of fiduciary duty by Defendants Grosvenor and Bowers, Banc has sustained significant damages.

206.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

207.   The misconduct of Defendants Grosvenor and Bowers – through both their actions and conscious inaction – is not exculpated under Maryland or other applicable law.

## COUNT IV

### Against Defendants Grosvenor and Bowers for Gross Negligence

208.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

209.   Defendants Grosvenor and Bowers, by reason of their positions as officers, and because of their ability to control the business and corporate affairs, owed to Banc an obligation to act in good faith, in a manner reasonably believed to be in the best interest of Banc, and with the ordinary care and candor that a prudent person would use in similar circumstances.

210.   Defendants Grosvenor and Bowers acted in a manner representing an extreme departure from the ordinary standard of care.

211.   Defendants Grosvenor and Bowers made or caused Banc to make false and misleading statements to shareholders regarding Banc's business and operations.

212.   As a direct and proximate result of the gross negligence by Defendants Grosvenor and Bowers, Banc has sustained significant damages.

213.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

214.   The misconduct of Defendants Grosvenor and Bowers – through both their actions and conscious inaction – is not exculpated under Maryland or other applicable law.

**COUNT V**

**Against Defendants All Defendants for Unjust Enrichment**

215.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

216.   Banc conferred benefits on each Defendant in the form of cash, fees, other compensation and/or stock awards, and it would be inequitable for each Defendant to retain those benefits under the circumstances.

217.   Each Defendant has been unjustly enriched at the expense of Banc.

218.   As a result of the misconduct alleged herein, each Defendant is liable to the Company for these sums.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Banc, demands judgment as follows:

A.   Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct and breaches of fiduciary duties;

B.   Directing Banc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Banc and its shareholders from a repeat of the damaging events described herein, including, but not limited to, adopting corporate governance policies to: (a) strengthen the Company's controls over financial reporting; (b) strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (c) strengthen Banc oversight of its disclosure procedures; and (d) prevent or undo self-dealing and related party transactions and Board entrenchment;

C.   Determining and awarding Banc the damages it sustained as a result of the violations set forth above and restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      Granting extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

E.      Determining and awarding Banc the damages sustained by it as a result of the Individual Defendants' breaches of fiduciary duties, as set forth above, from each of the Individual Defendants, jointly and severally, together with interest thereon; and

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable fees and costs to Plaintiff's attorneys, accountants, and experts.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: February 6, 2018          By: */s/ Willem F. Jonckheer*
                                 ROBERT C. SCHUBERT (S.B.N. 62684)
                                 WILLEM F. JONCKHEER (S.B.N. 178748)
                                 SCHUBERT JONCKHEER & KOLBE LLP
                                 Three Embarcadero Center, Suite 1650
                                 San Francisco, CA 94111
                                 Telephone:   (415) 788-4220
                                 Facsimile:   (415) 788-0161
                                 rschubert@sjk.law
                                 wjonckheer@sjk.law

                                 COREY D. HOLZER (pro hac vice)
                                 MARSHALL P. DEES (pro hac vice)
                                 HOLZER & HOLZER
                                 1200 Ashwood Parkway, Suite 410
                                 Atlanta, GA 30338
                                 Telephone:   (770) 392-0090
                                 Facsimile:   (770) 392-0029
                                 cholzer@holzerlaw.com
                                 mdees@holzerlaw.com

                                 *Counsel for Plaintiff*

VERIFICATION


I, Kristopher Gordon, hereby verify that I have authorized the filing of the attached Verified Amended Shareholder Derivative Complaint, that I have reviewed the Verified Amended Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.


DocuSigned by:

_____
Kristopher Gordon


Executed on this 5th day of February, 2018 in Atlanta, Georgia.